# IN RE JORDAN T.*
## (AC 30674)

DiPentima, Robinson and Sullivan, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued December 2, 2009—officially released March 9, 2010

*Richard P. Cahill,* for the appellant (respondent mother).

*Stephen G. Vitelli,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Trudy Condio,* for the minor child.

*Opinion*

SULLIVAN, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights as to her minor child, Jordan T.[1] On appeal, the respondent claims that the court improperly found that the petitioner, the commissioner of children and families, had proven by clear and convincing evidence that

---

[1] The court also terminated the parental rights of Jordan's father. Because he has not appealed, we refer in this opinion to the respondent mother as the respondent.

(1) she had not achieved a sufficient degree of personal rehabilitation and (2) termination of her parental rights was in the best interest of the child. In addition, the respondent claims that the court improperly prevented her from questioning Jordan's foster parent concerning the future contact between Jordan and her biological family in the event that the court terminated the respondent's parental rights.

The record reveals the following relevant facts and procedural history. The department of children and families (department) first became involved with Jordan after the respondent confessed to police that she had participated in the armed robbery of a Burger King restaurant. The respondent reported later that she had been intoxicated at the time and had been coaxed into participating by her boyfriend at the time. The respondent was arrested and taken into custody on December 30, 2006. Following her arrest, the respondent remained incarcerated between December, 2006, and April, 2007, when she posted bond and was released pending trial.

At the time of the respondent's arrest, she told the police about Jordan, who was then in the care of her maternal grandmother. The police notified the department, which invoked a ninety-six hour hold; see General Statutes § 17a-101g; after determining that the grandmother was not an appropriate placement due to her history of substantiated abuse and neglect allegations. The court granted an order of temporary custody to the petitioner on January 3, 2007. The department placed Jordan in a foster home, where she resided through the time of trial. Jordan was adjudicated neglected and committed to the care of the petitioner on March 22, 2007, and specific steps were implemented for the respondent to be reunified with Jordan.

While released on bond, the respondent worked on achieving the specific steps put in place for her, and

the department's plan for Jordan was reunification. The respondent found full-time employment and a suitable housing arrangement for herself and Jordan. Additionally, the respondent completed parenting education courses and began outpatient mental health and substance abuse counseling. The respondent visited with Jordan as often as possible, and she acted appropriately during those visits.

In November, 2007, the respondent pleaded guilty to robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), and, on January 11, 2008, she was sentenced to ten years imprisonment, execution suspended after fifty-five months, with three years of probation. She began serving her sentence in January, 2008. Following the respondent's incarceration, the petitioner changed her permanency plan to termination of parental rights and filed a petition to terminate the respondent's parental rights. The petitioner alleged as grounds for termination that the respondent had failed to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B)[2] and had abandoned Jordan within the meaning of § 17a-112 (j) (3) (A). Following trial on the petition, on December 4, 2008, the court issued its memorandum of decision finding that the respondent had failed to achieve a sufficient degree of personal rehabilitation. The court did not reach the alleged ground of abandonment. In the

[2] General Statutes § 17a-112 (j) (3) (B) provides for the termination of parental rights when the child "has been found by the Superior Court or Probate Court to have been neglected or uncared for in a prior proceeding, or (ii) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ."

dispositional phase, the court found that it was in Jordan's best interest to terminate the respondent's parental rights.

I

The respondent first claims that the court improperly determined (1) that she failed to achieve a sufficient degree of personal rehabilitation and (2) that termination is in Jordan's best interest. The respondent argues that the evidence in the record does not support the court's determinations. We disagree and, therefore, affirm the judgment of the court.

"Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the four grounds for termination of parental rights set forth in § 17a-112 [j] exists by clear and convincing evidence. The commissioner . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. In contrast to custody proceedings . . . in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. . . . Section [17a-112 (j)] carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . .

"If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 688–89, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999).

## A

We first address the respondent's claim that the court improperly terminated her parental rights on the ground that she had failed to achieve a sufficient degree of personal rehabilitation. The respondent argues that the evidence did not support this determination and that the only basis for the finding was her incarceration. The court found that she substantially complied with the specific steps ordered on March 22, 2007, and she argues that this court should hold that incarceration alone cannot be sufficient to prove failure to achieve a sufficient degree of personal rehabilitation, analogous to the rule that incarceration alone cannot satisfy the burden of proof for abandonment. See *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 645, 436 A.2d 290 (1980).

The court appointed David Mantell, a psychologist, to evaluate the respondent and Jordan and to present his expert opinion to the court. After the parties stipulated to his expertise as a clinical psychologist specializing in forensic evaluations in the area of child custody and family permanency, Mantell testified extensively concerning his evaluation and opinion of the respondent and Jordan. He testified that he would not recommend placement of Jordan with the respondent immediately following her release from prison and estimated that she would need to prove her reliability as a resource for at least one year upon her release. He also testified that the respondent had a history of parent-child relational problems with her own parents, an adult relational problem associated with her two most recent romantic partners, a history of alcohol abuse, antisocial behavior in committing the act of robbery and an adjustment disorder with mixed emotional features, including some depression, anxiety and paranoia.

There was extensive testimony concerning Jordan's difficulty visiting the respondent in prison. A social

worker, Lauren Delaney, assigned to the case by the department, testified that the department had been offering monthly visitation in prison, which had begun to be difficult for Jordan. Specifically, Delaney stated that after a visit in July, 2008, "it took Jordan about three or four weeks to recover from that visit. . . . [S]he was waking up . . . screaming during the middle of the night, crying. She was asking to stay in the home forever and to never leave. . . . She had started wetting the bed overnight. She was aggressive at school." Delaney also described various strategies employed by the department in conjunction with the respondent and the foster parent to help Jordan with her anxieties related to visiting the respondent in prison.

Delaney testified that the prison setting and missing the respondent were partly the cause of Jordan's negative reactions to the visits. Mantell agreed that the prison setting would be difficult for a child to adjust to, and he also testified that Jordan's negative reactions to the prison visits could be attributed to a decreasing ability to wait for reunification. He testified that these negative reactions might, in another context, necessitate immediate reunification, but noted that that solution was not available here. He also testified that, absent some other cause, Jordan's negative reactions to the visits strengthened his recommendation that she remain in the care of the foster mother and also may necessitate decreasing visitation with the respondent.

Following the trial, the court found, by clear and convincing evidence, that, on the date the petition for termination was filed, the respondent "was unable to satisfy even the minimal essential obligations of parenthood. . . . This inability to meet her parental obligations is largely a function of her incarceration. But it is also a function of 'psychological conflicts, social adjustment problems, alcohol abuse and probable dependency, and probably also adjustment problems

with depressed and anxious features, which have combined to cause her very substantial difficulties, dislocations and repeated disappointments,' as . . . Mantell noted." The court further noted that the respondent's "multitude of unresolved childhood handicaps, her history of inappropriate male relationships, her unacknowledged issues with alcohol, her criminal conduct, which resulted in her incarceration, and her inability to meet her parental responsibilities," provided the basis for its decision that the respondent had failed to achieve a sufficient degree of personal rehabilitation.

Our standard of review is well established. "[W]e review a trial court's finding that a parent has failed to rehabilitate herself in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, supra, 250 Conn. 705–706.

Section 17a-112 (j) provides in relevant part that the court may grant a petition for termination of parental rights "if it finds by clear and convincing evidence that . . . (B) the child . . . has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the

child, such parent could assume a responsible position in the life of the child . . . ."

"Personal rehabilitation, as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time." (Internal quotation marks omitted.) *In re Eden F.*, supra, 250 Conn. 706.

The respondent argues that the evidence does not support the conclusions made by the court concerning her "childhood handicaps" because her parenting up to the time of her incarceration had not been impacted by these challenges. The respondent refers to testimony by Delaney that the department would not have become involved with the family had it not been for the respondent's commission of the robbery. The court, however, made no finding concerning the suitability of the respondent's parenting prior to the removal of Jordan from her care, and any evidence suggesting that the department would never have become involved would be purely speculative. The court did find that "[l]ittle information is available to [the department] about [the respondent's] parenting between the child's birth in August, 2005, and the child's removal in December, 2006. The child did become very closely bonded with [the respondent] and with the extended family, especially [the respondent's] younger sister."

Even if we assume that the respondent had been appropriate in her parenting prior to her arrest, the court considered what impact her unresolved mental health issues had on the likelihood that she would achieve a sufficient degree of personal rehabilitation quickly enough to maintain a permanent and stable

parenting role in Jordan's life. The court relied on the opinion of Mantell in reaching the conclusion that the respondent had unresolved mental health issues owing to her own difficult childhood.

The respondent also argues that there was no evidence suggesting that she had used alcohol during the time she was released on bond, which would undermine the court's reliance on her unwillingness to receive treatment for alcohol dependence. The court made no finding concerning the respondent's use of alcohol during the several months she was released on bond,[3] but it did address the unwillingness of the respondent to engage in treatment for alcohol dependence during that same time period and her unwillingness to admit, even when questioned at trial, that she had an alcohol abuse or dependency problem. Concerning her alcohol use, the court wrote that the respondent "had given self-reports of heavy drinking in the months before the robbery. She reported that on the night of the robbery she was severely intoxicated by alcohol. She gave a history of blackouts from drinking earlier in her life. Based upon this information, the [Hockanum Valley Community Council, Inc. (council)] clinic physician made a diagnosis of alcohol dependence. . . . [The respondent] reported a desire to stop her alcohol use but had been unsuccessful at quitting. The doctor prescribed a drug to reduce alcohol cravings. Another [council] clinician also made a diagnosis of alcohol dependence and recommended a relapse prevention program and participation in Alcoholics Anonymous. . . . [T]he clinic notified [the department] that [the

[3] As the petitioner notes, there was some evidence in the record that the respondent did continue drinking even after the robbery incident. The petitioner's exhibit A, a letter from Katherine Paquette, a social worker at Hockanum Valley Community Council, Inc., which provided counseling to the respondent, states that the respondent "had continued to use alcohol intermittently despite its reported role influencing her decision to participate in the robbery last winter."

respondent] had stopped taking her anticraving medication. [The respondent] reported that she does not need the medication and disagreed with the diagnosis of alcohol dependence. . . . [The respondent] testified in court on November 20, 2008, illogically persistent as it may be, that 'I do not have a problem with alcohol.' This denial certainly raises issues about her fitness to serve as a parent upon release from incarceration."

The court placed great emphasis on the time frame for a possible reunification between the respondent and Jordan in reaching its conclusion that the petitioner had proven that the respondent had failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B). It noted Mantell's assessment that the respondent would likely need one year to establish herself in the community and found that her earliest possible release date is January 11, 2010. Following her release, she would have sixty-five months of possible incarceration remaining and be under probation supervision for three years. The court further found that, at the time of trial, Jordan had already been in out of home care for nearly two years and that it would be at least another two years from the time of the court's decision, or longer, before she could be reunited with the respondent. The respondent has not attempted to argue that the court's conclusions concerning the time frame for reunification for Jordan were factually incorrect or improper under § 17a-112.

The court acknowledged that the department had planned to reunify the respondent with Jordan prior to the respondent's incarceration. It also addressed the reality of the respondent's incarceration, including the difficulty posed by the visitations in the prison, which the respondent had at one point agreed to stop due to the impact on Jordan. The court wrote, however, that "the respondent [mother's] incarceration, in and of itself, does not dictate the determination that [she] has

failed to achieve rehabilitation . . . ." (Internal quotation marks omitted.)

The respondent has asked this court to hold that incarceration alone cannot serve as the basis for a finding that a parent has failed to achieve a sufficient degree of personal rehabilitation and argues that the court in the present case made such a finding. Upon review of the court's memorandum of decision, however, we cannot conclude that incarceration was, in the present case, the sole basis for the court's conclusion, nor can we conclude that it was clearly erroneous for the court to find that the respondent had failed to achieve a sufficient degree of personal rehabilitation. The court centered its analysis on the respondent's unwillingness to acknowledge that she had alcohol dependence, as well as on the amount of time that Jordan would be in foster care before the respondent could resume a constructive role in her life. The court relied on the evidence in the record, and despite the existence of any contrary evidence, we cannot substitute our judgment for that of the trial court.

B

The respondent next argues that the court improperly determined, in the dispositional phase of the trial, that termination was in the best interest of Jordan. The respondent argues that the evidence is insufficient to support the court's determination that termination of her parental rights is in the best interest of Jordan.[4] We hold that the court had sufficient evidence on which to base its decision and, therefore, affirm the judgment.

"In the dispositional phase of a termination of parent rights hearing, the trial court must determine whether

[4] The respondent also argues that the dispositional determination was improper because it was based on an improper determination in the adjudicatory phase. This argument has no merit because we have already affirmed the court's holding that the respondent had failed to achieve a sufficient degree of personal rehabilitation under § 17a-112.

it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. On appeal, we will disturb the findings of the trial court in both the adjudication and disposition only if they are clearly erroneous." (Internal quotation marks omitted.) *In re Vanna A.*, 83 Conn. App. 17, 26–27, 847 A.2d 1073 (2004).

The court properly considered and made written findings on the factors delineated in § 17a-112 (k), but the respondent's argument relies on evidence in the record tending to show that Jordan misses the respondent and is sad to be separated from her. She also refers to the report of Mantell that Jordan has several psychological parents, with the respondent being the first, the maternal aunt as the second and the foster mother as the third, and argues that the fact that Jordan is more closely bonded to the respondent shows that termination of the respondent's parental rights is not in Jordan's best interest.

Even if the evidence persuaded this court that termination was not in Jordan's best interest, it failed to convince the trial court. The court reasonably relied on contrary evidence in the record, including the testimony of Mantell. Mantell testified that none of the options available to the court were ideal and that the question of Jordan's best interest was one of minimizing harm. In light of that goal, Mantell testified that maintaining the security of Jordan's foster placement, which was likely to become her permanent adoptive home upon termination, would do less harm than waiting for the possible eventual rehabilitation of the respondent. We, therefore, cannot conclude that the court's determination of the best interest of the child was without the

support of evidence in the record. We affirm the judgment of the court.

## II

The respondent argues finally that the court improperly prevented her from questioning Jordan's foster mother concerning whether she would allow contact with the biological family if she adopted Jordan. The respondent characterizes the court's ruling as based on relevance, and she argues that, in light of the testimony that Jordan is strongly connected to her family, the question of whether postadoption contact would be allowed is highly relevant to the determination of Jordan's best interest.

Mantell had testified that Jordan's "ties to her biological family were really powerful and that she would sustain a huge loss if . . . those ties were severed." He stated that the foster parent had told him that if she adopted Jordan, she would permit "static information exchanges in the forms of pictures and things of that sort, with no personal contacts." He speculated that the foster parent's reluctance to permit Jordan ongoing contact with her biological family could be attributed to insecurity about Jordan's affections, a desire to protect Jordan from disappointments by unreliable family members or some combination of those factors.

Later in the proceeding, the respondent, through counsel, asked the foster mother, "[I]f you did in fact adopt her, what would be your plan for Jordan's contact with her biological family?" The petitioner objected, stating, in part, "[T]he issue of postadoption contact is really outside of the scope of these proceedings." The court sustained the objection. The respondent then argued that the evidence of continuing ties would be relevant to the court's decision concerning Jordan's best interest in light of the testimony by Mantell about the effect it would have on Jordan to sever ties with

the biological family. The court replied, "I heard from . . . Mantell on that. That's why I really don't want to hear particulars from this witness."

"Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion and a showing . . . of substantial prejudice or injustice. . . . Additionally, it is well settled that even if the evidence was improperly admitted, the [party challenging the ruling] must also establish that the ruling was harmful and likely to affect the result of the trial." (Internal quotation marks omitted.) *In re Anna Lee M.*, 104 Conn. App. 121, 126, 931 A.2d 949, cert. denied, 284 Conn. 939, 937 A.2d 696 (2007).

Section 4-3 of the Connecticut Code of Evidence states: "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or *needless presentation of cumulative evidence.*" (Emphasis added.) "Evidence is cumulative if it multiplies witnesses or documentary matter to any one or more facts that were the subject of previous proof. . . . The court's power in that area is discretionary. . . . In precluding evidence solely because it is cumulative, however, the court should exercise care to avoid precluding evidence merely because of an overlap with the evidence previously admitted." (Citations omitted.) *Glaser* v. *Pullman & Comley, LLC*, 88 Conn. App. 615, 627, 871 A.2d 392 (2005).

Although the department appeared to object on the basis of relevance and the court sustained the objection, the court later appeared to conclude that the proffered testimony would be cumulative of testimony already elicited from Mantell concerning the foster mother's

future plans for contact between Jordan and her biological family. Although the respondent now argues on appeal that she would have gone beyond just asking about what contact would be allowed, to determine the basis for the foster mother's decision and therefore better inform the court of the possibility for Jordan to have continued contact with her biological family, no such argument was made at trial. The respondent only proffered to question the foster mother regarding her plans, and that is what the court excluded. We cannot, therefore, conclude that the court abused its discretion in excluding as cumulative the testimony by the foster mother concerning her future plans, should she adopt Jordan, for contact between Jordan and her biological family.

The judgment is affirmed.

In this opinion the other judges concurred.