## IN RE SARAH O.*
## (AC 32449)

DiPentima, C. J., and Bear and Borden, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued March 8—officially released April 26, 2011

*Inez M. Diaz Galloza*, with whom, on the brief, was *Christina D. Ghio*, for the appellant (respondent mother).

*Colleen B. Valentine*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, former attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Linda K. Herzner*, for the minor child.

*Opinion*

BEAR, J. The respondent mother appeals from the judgment of the trial court rendered in favor of the petitioner, the commissioner of children and families, terminating her parental rights as to her daughter, Sarah O.[1] On appeal, the respondent claims that the court improperly (1) violated her due process rights or committed plain error by treating as competent evidence the posttrial position statement of Linda K. Herzner, the attorney appointed to represent Sarah and serve as the child's guardian ad litem;[2] (2) found that the

---

[1] The petitioner also filed a termination of parental rights petition as to the father of Sarah. He was defaulted prior to the hearing on the petition, and the court thereafter terminated his parental rights. Because only the respondent mother has appealed, we refer to her in this opinion as the respondent.

[2] Pursuant to General Statutes § 46b-129a: "In proceedings in the Superior Court under section 46b-129 . . . (2) a child shall be represented by counsel knowledgeable about representing such children who shall be appointed by the court to represent the child and to act as guardian ad litem for the child. . . ."

Herzner also has filed a position statement in this appeal on behalf of Sarah in which Herzner adopts the position of the petitioner.

department of children and families (department) had made reasonable efforts to reunify her with Sarah; (3) found that she had failed to achieve a sufficient degree of rehabilitation; and (4) found that termination of her parental rights was in the best interest of Sarah. We affirm the judgment of the trial court.

The court found the following facts, which are relevant for our review. The respondent is an articulate and intelligent woman, who has an associate's degree in business. She has maintained employment in the banking industry on a relatively consistent basis. The respondent has two children, a son, K, born in October, 1992, now of the age of majority, and Sarah, born in April, 2007. Neither child's father has been a significant factor in the lives of the children. The respondent has a history of alcohol abuse, benzodiazepine dependence and mental health issues, including anxiety and depression, which, during 2008, caused her to be hospitalized on five different occasions. She previously has participated in inpatient detoxifications and resident rehabilitation but ultimately has suffered relapses.

The department first became involved with the respondent's family when the respondent was admitted to Charlotte Hungerford Hospital (hospital) in Torrington for alcohol abuse on September 19, 2008. The hospital filed a neglect report with the department after the ambulance crew, which had transported the respondent to the hospital from her home, revealed that the home in which the respondent lived with her children "was filthy and that there was a very thin dog and cat and piles of animal feces in the house." The children, however, were not present at the home because K had requested assistance from his maternal grandparents on a prior date due to the respondent's continued incapacity from the consumption of alcohol, and the maternal grandparents had taken the children to their home.

After the department became involved, it permitted K to remain at the home of his maternal grandparents, but it removed Sarah because it believed that the home was in a state of disrepair and disorder, such that it was unsafe for Sarah. Initially, Sarah was placed with her maternal uncle and his girlfriend, who reported that when Sarah arrived she was unable to feed herself and almost exclusively obtained her "food" from a bottle containing either milk or cereal. They also reported that Sarah had no shoes and arrived with only two pairs of pajamas, both of which smelled of cat urine. Within one month of her placement with her maternal uncle and his girlfriend, Sarah seemed healthier and was eating more age appropriate table food.

After the respondent was discharged from the hospital in October, 2008, the department referred her to the hospital's partial hospitalization program after she declined to participate in further inpatient rehabilitation that had been recommended in a clinical consultation from Waterbury Hospital because she believed that it would interfere with the holidays with her children. She did indicate, however, that she would consider an intensive outpatient program at the McCall Foundation (McCall). Nevertheless, she did not contact McCall at that time.

On November 21, 2008, the respondent telephoned the department and notified it that she had been admitted to Waterbury Hospital on November 18, due to depression and alcohol abuse. The maternal uncle and his girlfriend revealed that they no longer could care for Sarah, and the department obtained from the court an order of temporary custody of Sarah on November 24, 2008. The court approved specific steps for the respondent to complete for the purpose of facilitating reunification, and Sarah was placed in a licensed foster home operated by a nonrelative. The respondent was discharged from Waterbury Hospital on November 26,

2008. She contacted McCall and participated in its program from December 5, 2008, to February 11, 2009.

McCall recommended that the respondent participate in Alcoholics Anonymous (AA) programs and that she obtain a sponsor. The respondent admitted that she did not follow this recommendation in a timely fashion, failing to attend AA meetings until April 22, 2009, or to get a sponsor until June.[3] The respondent also began attending counseling at Northwest Center in April, 2009. The respondent's therapist, Michelle Santos, accommodated the respondent's anxiety disorder and her work schedule by scheduling sessions every other week. On March 18, 2009, Sarah was adjudicated neglected[4] and committed to the care, custody and guardianship of the petitioner, and on May 20, 2009, the court again approved specific steps for the respondent to complete for the purpose of facilitating reunification with Sarah, including that she receive individual counseling to help her gain insight into her mental health issues and how her substance abuse impacts her children. Despite this required step, the respondent failed to attend counseling between September, 2009, and January, 2010, offering conflicting statements as to the reasons for her nonattendance during that time frame, in which she claimed a lack of insurance or, alternatively, that she had to work. She, however, did not tell the department

[3] The respondent's first sponsor reported that the respondent had failed to maintain daily contact or attend AA meetings with her. After this sponsor relocated, the respondent obtained another sponsor in August, 2009. The new sponsor initially reported that things were going well, but, by October, 2009, she stated that she had not seen or heard from the respondent recently and that she did not know if the respondent was attending AA meetings. Subsequently, this sponsor also left the area. The respondent stated that she had obtained another sponsor and gave her name to the court; the department, however, stated that it was not aware of the new sponsor.

[4] The respondent entered a plea of nolo contendere to the ground of the neglect petition alleging that K and Sarah were placed in conditions injurious to their health and well-being. See General Statutes (Rev. to 2007) § 46b-120 (9) (C).

or Santos that she was experiencing any financial or insurance related difficulties.

The respondent attended parenting classes at Family Strides and was receiving hands-on parenting training through Community Residences, Inc., an agency that oversaw the respondent's visits with Sarah until September, 2009. The respondent also attended supervised visits with Sarah on a consistent basis, and her behavior at these visits was appropriate. At the time of trial, these supervised visits had been ongoing and lasted one and one-half hours to two hours each week. However, employees of the department, as well as visitation supervisors, reported that Sarah appeared to have more of a parental relationship with K, her brother, than she did with the respondent.

With only one possible exception, no provider or department employee had noted any evidence that the respondent had consumed any alcohol since November, 2008.[5] All drug tests also had been negative, and the respondent maintained that she remained sober.

Following a temporary period of unemployment, the respondent was evicted from her home in 2009 for non-payment of rent, and she moved into the home of her parents.[6] The department, however, already had

[5] Marilyn Flores, a former department employee, testified that she thought she smelled alcohol when leaning close to the respondent in early February, 2010. The court, however, stated that it did not give much weight to this suspicion in light of the respondent's continued clean drug screens and the testimony of other witnesses.

[6] There is evidence in the record that the respondent's mother was dying of cancer and that she died during the pendency of this proceeding. After her mother died, the respondent continued to work with her therapist on her identified goals of achieving financial and housing stability, compliance with other specific steps, and development of insight into how she had reached her present circumstances. At the trial in March, 2010, the respondent's therapist testified that the respondent needed to continue in therapy and that they still were working on issues that included maintaining financial stability, obtaining stable housing, and achieving other goals established by the department. At trial, the court evaluator reported that the respondent had made progress in her goals of remaining sober and securing employment

deemed the home unsuitable for Sarah.[7] Social workers from the department conducted a home visit on December 31, 2009, and reported that the home was dark, dreary, cluttered and dirty; there was no siding on the walls and there was exposed insulation; there was a cat litter box on the floor, and the home smelled of urine and feces; and the workers were not permitted to enter the bedrooms because they were, in the words of the respondent, " 'a disaster.' " The respondent agreed that the home was not suitable for Sarah. When the social workers returned for another home visit on January 20, 2010, they saw much of the same. Additionally, they noted an unlocked gun cabinet with the door slightly ajar.[8] K permitted the workers to enter his bedroom, and they noted that his room was tidy.

The respondent testified that she had paid for some repairs to be made to her father's home but that there was so much to be done that it was overwhelming. She indicated that if Sarah were permitted to return to her, they would share a bedroom there, however. Although a friend of the respondent had offered K, Sarah and the respondent an appropriate place to stay, the respondent stated that she had declined the offer because she did not want K to have to change schools.

but had not become involved in individual and parenting counseling sufficiently to gain insight into her mental health issues, to understand how her substance abuse impacted her children, and to build up her parenting skills to the point that she was capable of fulfilling the responsibilities of a healthy parent. The evaluator found that the respondent did not understand the effect of her behavior on her children. The trial court found that the mother had not been able to provide suitable long-term housing for Sarah, her son and herself since September, 2008. The effect of her inability or unwillingness to find such housing was to have Sarah remain in foster care. In September, 2008, Sarah was approximately seventeen months old, and eighteen months later at the end of March, 2010, Sarah was almost three years old.

[7] The department, in October, 2008, had reported that the home was cluttered, had dishes in the sink, insulation hanging from the ceiling and many filled garbage bags near a woodstove.

[8] There is no indication in the record that there were any guns present in the cabinet.

The court found that there were three primary areas of concern that affected the respondent's ability to parent Sarah properly, namely, her ability to remain sober, her mental health issues and her ability to provide a safe and appropriate home for Sarah. As to the respondent's ability to remain sober, the court stated that it could find "no clear and convincing evidence that contradicts [the respondent's] assertion that she is currently clean and sober and has been since November, 2008." Nevertheless, the court noted that the respondent successfully has maintained her sobriety for various lengths of time in the past, only to relapse. The court also found that the respondent's absences from necessary therapy could have been avoided if the respondent really had wanted to attend her sessions. It also noted that the respondent had failed to achieve her goal of gaining insight into her mental health issues and how her substance abuse impacts her children. The court also found that the respondent lacked any insight into how her living conditions affected K and that this demonstrated the unlikeliness of her being able to recognize and respond to problems that might affect Sarah in the future. The court further indicated that it was troubled by the respondent's moving into her father's home in 2009 and continuing to live there even after being told, and admitting herself, that the home was not suitable for Sarah. Although the respondent testified that she had been attempting to fix up her father's home, but that there was too much work needed, the court found that by expending resources on her father's home, she had further delayed finding a suitable home for Sarah, effectively opting to leave her in foster care. The court further explained: "The result is that eighteen months after Sarah was removed, [the respondent] still cannot offer her a safe and secure home."

On the basis of these facts, the court, in the adjudicatory phase of the proceedings, found "by clear and

convincing evidence that [the respondent] ha[d] failed to achieve such degree of rehabilitation as to encourage the belief that within a reasonable period of time, she could assume a role as a parent for Sarah. Accordingly, for all the reasons stated above, the court [further found that] the petitioner ha[d] met her burden and proved . . . the 'failure to rehabilitate' ground [of the petition to terminate parental rights] by clear and convincing evidence as to [the respondent]."

In the dispositional phase of the case, the court looked to whether termination was in the best interest of Sarah, considering and making written findings regarding the seven factors delineated in General Statutes § 17a-112 (k).[9] The court found that the department had made reasonable efforts to reunite the respondent and Sarah and had made numerous services available to them. The court further found that the respondent

---

[9] General Statutes § 17a-112 (k) provides in relevant part: "[I]n determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child . . . (2) whether the Department . . . has made reasonable efforts to reunite the family . . . (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

had failed to comply with the specific steps that were necessary to enable her to rehabilitate and to parent Sarah effectively within a reasonable period of time. It found that she had failed to obtain suitable housing for Sarah and that her therapy attendance had been problematic. The court further found that, although the respondent had made progress, she "remain[ed] unable to offer Sarah secure, safe accommodation." The court then found, "by clear and convincing evidence, that it [was] in the best interest of Sarah and that it is necessary for her well-being, growth, development, safety, security, stability, continuity, consistency and permanency, and for closure, that the right of [the respondent] be terminated." This appeal followed. Additional facts will be set forth as necessary.

I

The respondent claims that the court violated her due process rights or committed plain error by treating as competent evidence Herzner's posttrial position statement, which she claims provided extrarecord posttrial evidence rather than a mere statement of Herzner's position. The respondent acknowledges that she did not raise this claim before the trial court rendered its decision but seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[10] or the plain error doctrine, codified in Practice Book § 60-5.[11]

Under *Golding*, a party "can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is

---

[10] *Golding* review is applicable in civil as well as criminal cases. *Perricone* v. *Perricone*, 292 Conn. 187, 212 n.24, 972 A.2d 666 (2009).

[11] Practice Book § 60-5 provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record, or that the decision is otherwise erroneous in law. . . . The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the [petitioner] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the [respondent's] claim will fail. The appellate tribunal is free, therefore, to respond to the [respondent's] claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *In re Tremaine C.*, 117 Conn. App. 521, 528–29, 980 A.2d 317, cert. denied, 294 Conn. 920, 984 A.2d 69 (2009). To be entitled to prevail under the plain error doctrine, the respondent must show that failure to remedy an obvious error would result in manifest injustice. See, e.g., *State v. Myers*, 290 Conn. 278, 289, 963 A.2d 11 (2009) ("[an appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice" [internal quotation marks omitted]). In this case, we conclude that the court's consideration of the position statement was harmless because much of the information contained therein was cumulative, and, in light of this conclusion, we find that such consideration did not result in a manifest injustice constituting plain error.[12]

The following additional procedural history is relevant. At the close of trial on March 31, 2010, the court and the parties, including Herzner, discussed the timing of posttrial briefs. The court stated that the petitioner's

---

[12] Because it is clear that the court's consideration of the position paper was harmless, we need not consider the other prongs of *Golding*. See *In re Tremaine C.*, supra, 117 Conn. App. 528–29.

brief would be due by April 14, 2010, and that the respondent's brief was due on April 28, 2010. The court asked Herzner if she preferred to submit a posttrial brief or a position statement. She opted for the position statement, which the court ordered to be submitted by May 5, 2010, after the parties had filed their briefs. All parties agreed to this schedule.[13]

Herzner submitted her position statement to the court, dated May 20, 2010,[14] stating that she supported the petitioner's position and recommending that the respondent's parental rights be terminated because it was in Sarah's best interest. In addition to a statement of her position, however, Herzner also provided the court with some information on the posttrial situation of the respondent and her children. This information, the respondent argues, was improper extrarecord evidence of posttrial events, the consideration of which violated her right to due process and created a manifest injustice. We conclude that any violation was harmless beyond a reasonable doubt, there being clear and convincing record evidence to support the court's decision; this evidence will be discussed in parts II and III of this opinion.

## II

The respondent also claims that the court erred when it found that the department had made reasonable efforts to reunify her with Sarah because the department never provided her with individual treatment or with housing assistance. We disagree.

"In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear

---

[13] The petitioner argues that the respondent waived her right to challenge the court's consideration of the position statement by failing to object at this time. We are not persuaded by this argument in light of the content of the position statement, which contains factual allegations in addition to Herzner's statement of her position.

[14] The actual date of submission is not in the record.

and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . . [Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made." (Citation omitted; internal quotation marks omitted.) *In re Devon W.*, 124 Conn. App. 631, 642, 6 A.3d 100 (2010).

We have carefully reviewed the record, which reveals that there was clear and convincing evidence to support the court's finding that the department had made reasonable efforts to reunify the respondent with Sarah. The respondent was offered many services to support her in attaining the steps necessary to secure reunification, including the hospital's partial hospitalization program, intensive outpatient treatment at McCall, parenting education programs, AA, Community Residence, Inc., All Point visitation services, case management services by the department, and a referral to the department of social services and licensed foster care for Sarah. Although the respondent argues that the department did not make reasonable efforts because it

failed to provide her with individual treatment or housing assistance, we conclude that the efforts made by the department were sufficient. "[R]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 632, 847 A.2d 883 (2004). In this case, the respondent did obtain counseling, albeit initially through self-referral; she, nonetheless, was in treatment. Her failure to make regular and continued use of this treatment, or to make progress with her mental health issues, was not the fault of the department. As for her allegation that the department had a responsibility to provide housing assistance for her, the record reveals that the respondent knew that her housing situation was unsuitable for Sarah, yet, she made no effort to secure suitable housing despite being offered a place to stay by a friend and being encouraged by the department to have this friend attend a meeting with department personnel. The respondent also testified that she was using her own resources to fix up her father's home, despite knowing that the work needed to be done was overwhelming. Rather than spend those resources on a safe and secure home for her and Sarah, she chose to do otherwise, leaving Sarah in foster care. Furthermore, when the respondent was facing eviction from her apartment in 2009, the department referred her to the department of social services, but the respondent chose not to make contact. On the basis of this evidence, we conclude that the court's finding that there was clear and convincing evidence that the department had made reasonable efforts to reunify the respondent and Sarah was not clearly erroneous.

III

The respondent next claims that the court erred in finding that she had failed to achieve a sufficient degree of rehabilitation. We disagree.

Our standard of review is well established. "[W]e review a trial court's finding that a parent has failed to rehabilitate herself in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jordan T.*, 119 Conn. App. 748, 755, 990 A.2d 346, cert. denied, 296 Conn. 905, 992 A.2d 329 (2010).

In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence that "(B) the child . . . has been found by the Superior Court or the Probate Court to have been neglected or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

The respondent argues that "[t]he record unmistakably demonstrates that the mother benefited from [the department's] services to reunify her with Sarah and is now able to care for Sarah once she secures appropriate housing." We agree that the respondent benefited from the department's services and that she made progress, for which she should be proud; nevertheless, the record

supports the court's finding that she failed to rehabilitate sufficiently, such that she could parent Sarah within a reasonable amount of time.

Our Supreme Court has instructed that "[i]n determining whether a parent has achieved sufficient personal rehabilitation, a court may consider whether the parent has corrected the factors that led to the initial commitment, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department. . . . Accordingly, successful completion of expressly articulated expectations is not sufficient to defeat a department claim that the parent has not achieved sufficient rehabilitation." (Internal quotation marks omitted.) *In re Melody L.*, 290 Conn. 131, 150–51, 962 A.2d 81 (2009).

In this case, everyone, including the respondent, agreed that her father's home was not an appropriate location for Sarah. Yet, the respondent continued to stay in that home while her daughter was in foster care. Although she apparently had some resources, she expended those resources to begin to fix up her father's home, knowing that it had overwhelming problems, while her daughter remained in foster care. Further, although given an opportunity by a friend to move to a more appropriate home, she declined the invitation, while her daughter remained in foster care. It appears that she simply did not recognize the urgency of the situation, but, instead, believed that her daughter could wait out the housing situation while remaining in foster care. Additionally, the court was troubled by the respondent's failure to recognize the impact of her living conditions and her choices on her son and on Sarah. We conclude that the record supports the court's concerns and its findings. Accordingly, we conclude that the court's finding that the respondent has failed to achieve such a degree of rehabilitation as to encourage the belief that within a reasonable period of time, she could

assume the role of parent for Sarah was not clearly erroneous.

IV

The respondent next claims that the court erred in finding that termination of her parental rights was in Sarah's best interest. We disagree.

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . It is well settled that we will overturn the trial court's decision that the termination of parental rights is in the best interest of the children only if the court's findings are clearly erroneous. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [his or her] environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child." (Citations omitted; internal quotation marks omitted.) *In re Janazia S.,* 112 Conn. App. 69, 97–98, 961 A.2d 1036 (2009).

In this case, the court explained that by the time of trial Sarah had been out of her mother's care for more than one half of her three year life, due, in no small part, to the respondent's living arrangements and inability to appreciate how her life choices have affected her children. Even at the time of trial, the respondent, although recognizing herself that her father's home was unsafe and inappropriate for Sarah, continued to reside at her father's home while Sarah remained in foster care. Furthermore, although Sarah and the respondent had a bond, and it was obvious to those supervising their visits that the respondent loved Sarah, Sarah looked more to her teenaged brother, K, as her parent

and appeared to have a closer parental type bond to him than she did to the respondent. Furthermore, the court concluded that although the respondent "did make some progress in that she has remained sober, she has consistently failed to make reunification with Sarah a priority in her life." It was on the basis of these facts that the court, in looking to the future, found that it was not in Sarah's best interest to continue the respondent's parental rights. We conclude that the court's finding was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.