******************************************************************

   The ''officially released'' date that appears near the beginning of this opinion is the date the opinion was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

   This opinion is subject to revisions and editorial changes, not of a substantive nature, and corrections of a technical nature prior to publication in the Connecticut Law Journal.

******************************************************************

# IN RE XAVIER H.*

## (AC 43770)
## (AC 43774)

Bright, C. J., and Prescott and Alexander, Js.

*Syllabus*

The respondent parents filed separate appeals to this court from the judgment of the trial court terminating their parental rights with respect to their minor child, who had previously been adjudicated neglected. The respondents claimed, inter alia, that the trial court improperly concluded that they had failed to achieve the requisite degree of personal rehabilitation as would encourage the belief that within a reasonable time they could assume responsible positions in the child's life as required by the applicable statute (§ 17a-112). *Held*:

1. The respondent father's claim that the trial court made clearly erroneous subordinate factual findings and applied those findings in reaching its decision that there was sufficient evidence to terminate the father's parental rights was unavailing; contrary to the father's claim that the evidence demonstrated that he complied with each of the specific steps ordered by the court, there was ample evidence in the record that the Department of Children and Families was unsuccessful in offering therapy service providers to the father because the father rejected those providers and, instead, chose his own providers and lied to his chosen providers, which made his therapy unsuccessful, the father admittedly did not participate in mediation or couples counseling and was untruthful about his continuing relationship with the respondent mother, and, although the court's factual finding that the father was in the courtroom and had seen a video that showed him entering the mother's apartment at 1:55 a.m. prior to his testimony that he had arrived at the apartment at 5:15 a.m., was in error, such error was harmless because it did not undermine the court's principal finding that the father lied to the court about his time of arrival at the apartment.

2. The respondents could not prevail on their claims that the trial court failed to employ the proper standard in assessing whether, pursuant to § 17a-112 (j) (3), the respondents had each failed to achieve a sufficient degree of personal rehabilitation as would encourage the belief that within a reasonable time they could assume a responsible position in the child's life: although the court did not employ the precise statutory language, it correctly set forth the legal standard at the beginning of its analysis and found by clear and convincing evidence that the department provided reasonable efforts for reunification of the child with the respondents but that the respondents did not achieve the required level of rehabilitation, the court having found that the father had made no progress on the key issue on which the court relied for termination, domestic violence in the relationship between the father and the mother, and concluded that he failed to understand and to address this issue, and lied to the department, his therapist and the court about the status of his relationship with the mother; moreover, the trial court found that the mother had consistently shown resistance to participating in any domestic violence counseling program, and, despite the violence in the relationship, continued a relationship with the father and continued to lie about it, she had not gained an understanding of the deleterious effects of such violence and lacked the ability to care for the needs of the child as those needs relate to the issues surrounding domestic violence, she repeatedly undermined the child's relationship with the foster mother, she abused medications and she self-discharged from an intensive inpatient care program.

3. The respondent father could not prevail on his claim that the trial court failed to apply in a proper manner the factors set forth in § 17a-112 (k) when conducting its analysis of whether termination was in the child's best interest: the court listed and made written findings on each of the seven factors set forth in § 17a-112 (k) and found that the father had not fulfilled his obligation under the terms of the court-ordered specific

steps; moreover, any lack of clarity on the specific statutory factor directing the court to consider the child's emotional ties was harmless because, when the court's memorandum of decision was read as a whole, this court concluded that, although the court did not explicitly address the child's emotional ties to the father, it discussed their relationship, as well as the child's bond with his foster family, and found that the child, only three years, ten months old, had been out of his parents' care for more than thirty-four months, and, even if the child had strong emotional ties to the father, the court's determination that termination of the father's parental rights was in the child's best interest was factually supported and legally sound.

4. The respondent mother could not prevail on her claim that the trial court failed to employ the proper standard in assessing whether she had failed to rehabilitate; although the court did not employ precise statutory language, it correctly set forth the legal standard at the beginning of its analysis and found by clear and convincing evidence that the department provided reasonable efforts for reunification of the child with the mother and set forth sufficient factual and legal findings to meet the statutory standard for the adjudicatory requirements of § 17a-112 (j) (3) (B) (i).

5. The trial court's written findings and conclusions that the minor child's best interest would be served by granting the petition to terminate the respondent mother's parental rights sufficiently complied with § 17a-112 (k) and, accordingly, the court's ultimate conclusion that it was in the child's best interest to terminate the mother's parental rights was factually supported and legally sound: the court listed and made written findings on each of the seven factors set forth in § 17a-112 (k) and found that the mother had not fulfilled her obligation under the terms of the court-ordered specific steps; moreover, any ambiguity in the court's findings concerning the child's emotional ties with the mother did not undermine the court's determination that termination of the mother's parental rights was in the child's best interest, as there was evidence that the court considered the mother's relationship with the child and the dangers presented by it, and that the child had developed significant emotional ties with his foster family; furthermore, the court made sufficient findings addressing the mother's efforts to adjust her circumstances, as the court considered evidence that the mother resisted participation in domestic violence counseling, repeatedly undermined the child's relationship with his foster mother, repeatedly sought modifications of protective orders for herself issued against the father on the father's behalf, lied about her ongoing relationship with the father and failed to make meaningful changes in her life.

Argued September 8—officially released October 22, 2020**

*Procedural History*

Petition by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor child, brought to the Superior Court in the judicial district of New London, Juvenile Matters at Waterford, and tried to the court, *Hon. Michael A. Mack*, judge trial referee; judgment terminating the respondents' parental rights, from which the respondents filed separate appeals to this court. *Affirmed.*

*Joseph Jaumann*, assigned counsel, for the appellant in Docket No. AC 43770 (respondent father).

*Mildred Doody*, assistant public defender, for the appellant in Docket No. AC 43774 (respondent mother).

*Sara Nadim*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee in Docket Nos. AC 43770 and AC 43774 (petitioner).

*Don M. Hodgdon*, for the minor child in Docket Nos.

AC 43770 and AC 43774.

*Opinion*

BRIGHT, C. J. In Docket No. AC 43770, the respondent father appeals from the judgment of the trial court terminating his parental rights as to his son, Xavier H. He claims that the trial court (1) made clearly erroneous factual findings, (2) failed to employ the proper standard in assessing whether, pursuant to General Statutes § 17a-112 (j) (3), he failed to rehabilitate to such a degree as to reasonably encourage a belief that he could assume a responsible position in Xavier's life, and (3) failed to apply in a proper manner the statutory factors set forth in § 17a-112 (k) when conducting its analysis of whether termination was in Xavier's best interest.

In Docket No. AC 43774, the respondent mother appeals from the judgment of the trial court terminating her parental rights as to her son, Xavier H. The respondent mother claims that the trial court (1) failed to employ the proper standard in assessing whether, pursuant to § 17a-112 (j) (3), she failed to rehabilitate to such a degree as to reasonably encourage a belief that she could assume a responsible position in Xavier's life, (2) erred in finding that she had failed to rehabilitate, and (3) failed to make complete written findings concerning the statutory factors set forth in § 17a-112 (k) when considering whether termination was in Xavier's best interest. We disagree with the claims in each appeal and, accordingly, affirm the judgment of the trial court.[1]

Initially, we briefly set forth some of the facts found by the trial court and the procedural history that are relevant to both appeals. Both parents have significant issues that led to the petitioner, the Commissioner of Children and Families, taking Xavier into her custody. Those issues have been present from Xavier's birth through the date of the court's judgment in this matter. The Department of Children and Families (department) has had involvement with the respondent mother dating back to 2005, when issues involving domestic violence, substance abuse, and criminal activities were addressed. Ultimately, on March 28, 2008, the respondent mother's parental rights as to another child were terminated after the petitioner filed a petition, and guardianship of that child was transferred to the child's maternal grandparents. Those same issues exist with respect to Xavier, but, this time, they include the respondent father of Xavier, as well. Those issues include unresolved substance abuse, mental health concerns, domestic violence, lack of housing, and criminal involvement.

On January 10, 2017, the department invoked a ninety-six hour hold on Xavier, and, on January 11, 2017, the petitioner filed with the court a motion for an order of temporary custody and a neglect petition with respect to Xavier. The court granted the order of temporary custody, and it found that the department had made

reasonable efforts to prevent or to eliminate the need for removal. On April 18, 2017, the court adjudicated Xavier neglected and committed him to the care and custody of the petitioner until further order of the court. The court ordered specific steps for each respondent to take. On December 12, 2017, the court approved a concurrent permanency plan of termination of parental rights and adoption or reunification with the respondents.

Via a petition filed on June 8, 2018, the petitioner sought the termination of the parental rights of the respondent father and the respondent mother as to Xavier. In the petition, the petitioner alleged that Xavier had been adjudicated neglected in a prior proceeding and that neither the respondent father nor the respondent mother had achieved a degree of personal rehabilitation that would encourage the belief that, within a reasonable time, considering the age and needs of Xavier, either of them could assume a responsible position in Xavier's life. The court, pursuant to § 17a-112 (j) (3) (B) (i),[2] granted that petition in a November 25, 2019 memorandum of decision. This appeal followed.

"We begin with the applicable standard of review and general governing principles. Although the trial court's subordinate factual findings are reviewable only for clear error, the court's ultimate conclusion that a ground for termination of parental rights has been proven presents a question of evidentiary sufficiency. . . . That conclusion is drawn from both the court's factual findings and its weighing of the facts in considering whether the statutory ground has been satisfied. . . . On review, we must determine whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . When applying this standard, we construe the evidence in a manner most favorable to sustaining the judgment of the trial court. . . . To the extent we are required to construe the terms of [§ 17a-112 (j) (3)] or its applicability to the facts of this case, however, our review is plenary. . . .

"Proceedings to terminate parental rights are governed by § 17a-112. . . . Under [that provision], a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3) (B) (i)] exists by clear and convincing evidence. The [petitioner] . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. . . . Subdivision (3) of § 17a-112 (j) carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervail-

ing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Internal quotation marks omitted.) *In re Tresin J.*, 334 Conn. 314, 322–23, 222 A.3d 83 (2019).

"[I]n order to prevail on a petition for the termination of parental rights pursuant to § 17a-112 (j) (3) (B) (i), the petitioner must prove by clear and convincing evidence the department's reasonable efforts or the parent's inability or unwillingness to benefit therefrom, and that termination is in the best interest of the child. In addition, under . . . § 17a-112 (j) (3) (B) (i), the petitioner must prove by clear and convincing evidence that 'the child . . . has been found by the Superior Court or the Probate Court to have been neglected, abused or uncared for in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . .' " *In re Jayce O.*, 323 Conn. 690, 711–12, 150 A.3d 640 (2016).

## I

### AC 43770

The respondent father claims that the trial court (1) made clearly erroneous subordinate factual findings, (2) failed to employ the proper standard in assessing whether, pursuant to § 17a-112 (j) (3), he failed to rehabilitate to such a degree as to reasonably encourage a belief that he could assume a responsible position in Xavier's life, and (3) failed to apply in a proper manner the statutory factors set forth in § 17a-112 (k) when conducting its analysis of whether termination was in Xavier's best interest. After setting forth the relevant facts as found by the trial court concerning the respondent father, we will consider each of these claims in turn.

The respondent father has a criminal history that includes, but is not limited to, assault in the third degree, violation of a protective order, violation of a restraining order, carrying a dangerous weapon, failure to appear, breach of the peace, and battery; he also was found in violation of the conditions of his probation. He has been incarcerated. The department attempted to engage him in services but had little success. Attempts to engage him in substance abuse evaluations and screenings failed at least ten times before he finally engaged, after which it finally was discovered that he did not meet

the criteria for substance abuse disorder, and that treatment was not recommended. Nancy Randall, a psychologist who is an expert in clinical and forensic psychology, diagnosed the respondent father with adjustment disorder and personality disorder (not otherwise specified) with antisocial and narcissistic features. He is in need of therapy to work toward accepting personal responsibility, anger control, relationship issues, and to get a better understanding of Xavier's needs, including the impact on Xavier of being exposed to conflict, violence, and/or substance abuse.

The court further found that the respondent father had denied to Randall that there had been any physical violence between the respondent mother and him, but he could not explain the existence of nine protective or restraining orders placed against him to protect the respondent mother. Although he persisted in his contention that there had been no violence, the respondent mother acknowledged that domestic violence started six months after their relationship began more than ten years ago, as of the date of the trial in this case. The court found that the respondent father was neither honest with the department nor with Randall when he maintained that he and the respondent mother were no longer in a relationship. It took the persistence of a department employee to observe the respondent father going to the respondent mother's home late at night and staying for long hours on multiple occasions to establish the falsity of the respondent father's claim. The court concluded that honesty was not a strong point in the respondent father's management of his situation with the department. The court further noted that, although the father is still in a relationship with the respondent mother, he has not participated in any couples therapy with the respondent mother or in mediation, and Randall thought it likely that continued contact between them would result in further violence and conflict.

The court further found that the respondent father intentionally did not reveal to his therapists that he still was involved with the respondent mother. The respondent father completed an intake at United Community and Family Services (family services) for individual therapy and attended regularly with Joseph LaBrecque, a licensed professional counselor. He was working on improving and/or fostering healthy relationships with others. Although the respondent father was supposed to be receiving dialectical behavior therapy, as had been recommended and encouraged by Randall, LaBrecque is not a trained dialectical behavior therapy clinician.[3] The respondent father, however, also received therapy services from Joyce LeCara. The court specifically pointed out that LeCara testified, in response to questions by counsel for the petitioner, that, if the respondent father was having contact with the respondent mother, he would be putting himself at risk.

Additionally, the court also discussed a video that had been introduced into evidence by the petitioner, showing the respondent father arriving at the home of the respondent mother on April 27, 2019 at 1:55 a.m. The court noted that the respondent father "was in the courtroom when [the video] exhibit . . . was introduced with much discussion as to where it came from and what it showed. Knowing that, [the respondent] father still took the stand to testify under oath and included in that testimony that he did indeed go to [the respondent] mother's apartment on April 27, 2019, arriving at 5:15 a.m. [The video, however] is the security monitor . . . video which shows [the respondent] father arriving at [the respondent] mother's apartment at 1:55 a.m. that morning and the two of them departing after 6:00 a.m. that morning." The court then found: "If [the respondent] father cannot be honest with the court while under oath knowing that the court has access to the [video] exhibit which shows the actual time he arrived, the court must conclude and does conclude that [the respondent father] has terrible difficulty with managing the truth in any aspect of his interactions with others in every other aspect of his life, including with clinicians who are trying to help him improve his mental disposition. Clinicians depend on the honesty of their patients while trying to improve their patient's mental health. Without honesty, they can do nothing. Veracity cannot be noted as a strong point of [the respondent] father's character in any aspect of this case. The evidence established that [the respondent] mother and [the respondent] father were together five consecutive days in April, 2019 (23rd through and including the 27th) after they had disengaged from coparenting training because the relationship was too toxic."

After making these subordinate factual findings, the court found, by clear and convincing evidence, that the department had provided reasonable efforts for and on behalf of the respondent father to reunite him with his child but that the respondent father was "unwilling to engage with the resources offered by the [department] and chose to make his own way with providers of his choice and then attempted to deceive each of them by failing to be truthful with them. The result was that he failed to benefit from their efforts." The court then found that the respondent father had not "achieved any level of rehabilitation [that] might encourage the belief that within a reasonable time [he] might reach a point where reunification with Xavier was in Xavier's best interest." In the dispositional portion of its decision, the court examined the seven factors set forth in § 17a-112 (k), and concluded that it was in Xavier's best interest for the respondent father's parental rights to be terminated. Additional facts relevant to the respondent father's appeal will be set forth as necessary.

A

First, the respondent father claims that the trial court made clearly erroneous subordinate factual findings. He argues that the court made "several clearly erroneous subordinate factual findings and then applied said findings" in reaching its decision that "there was sufficient evidence to terminate [the respondent] father's parental rights."

"A finding is clearly erroneous when either there is no evidence in the record to support it, or [if] the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *In re Sarah O.*, 128 Conn. App. 323, 336, 16 A.3d 1250, cert. denied, 301 Conn. 928, 22 A.3d 1275 (2011).

The respondent father first argues that the court's factual finding that the department had "attempted to engage him . . . in services, but [had] little success" was unsupported by the evidence, which, he argues, demonstrated that he had "substantially if not completely complied with every specific step listed on the January, 2017 specific steps ordered by the court." He argues that the evidence demonstrates that he complied with Randall's recommendations, engaged in domestic violence services, individual therapy with LaBrecque, dialectical behavior therapy with LeCara, and coparenting therapy. He contends that he provided drug testing samples, a substance abuse evaluation, consistent visitation with Xavier, and that all of the clinicians indicated that he had made progress and the department admitted that he was compliant with all specific steps and services.

We conclude that the court's factual finding that the department had "attempted to engage him . . . in services, but [had] little success" was not clearly erroneous. There is ample evidence in the record that the department was unsuccessful in offering service providers to the respondent father because he rejected those providers and, instead, chose to find his own providers. Additionally, the court heard extensive evidence that the respondent father repeatedly lied to his chosen providers, which made his therapy unsuccessful.

The respondent next argues that the court's factual finding that the respondent father "has not participated in mediation or couple counseling" was clearly erroneous. The respondent father then argues that he was not in a relationship with the respondent mother so such services were not required and the department never asked him to engage in such services. We conclude that the court's finding was not clearly erroneous. Regardless of whether these services specifically were required by the department, the respondent father admits that he did not participate in such services, which was the finding of the court. The respondent father continually told the department and his service providers that he

and the respondent mother were not in a relationship. The evidence, however, tends to demonstrate otherwise. There also is evidence that if the respondent father had been honest with the department and his providers, additional therapy would have been required.

Next, the respondent challenges the court's factual finding that the respondent father was in the courtroom when the video of his stay at the respondent mother's home was played and that he had lied to the court about not getting to the home until 5:15 a.m. He contends that the video showing his arrival at the respondent mother's home at 1:55 a.m. and leaving her home at 6 a.m. was not played before his testimony but that it was introduced during the petitioner's rebuttal, which occurred after his testimony. He argues: "The court's findings . . . lead the court to conclude erroneous[ly] that the respondent [father] is untruthful because he testified after being aware and seeing video about when he arrived [and departed] the [respondent] mother's residence." Although part of the court's factual finding may have been in error, it appears that the respondent father misses the import of the whole of the court's finding, which was that the respondent father lied to the court during his testimony. We conclude that the court's finding that the respondent father had seen the video before he lied during testimony was in error, but the error was harmless because it did not undermine the court's principal, and undisputed, finding that the respondent father had been untruthful to the court about the time of his arrival at the respondent mother's home.

The respondent father makes several additional arguments concerning alleged clearly erroneous factual findings. We have reviewed and considered each of them, but find them to be meritless, and we conclude that they do not warrant discussion. Accordingly, we conclude that the court's subordinate factual findings were not clearly erroneous.

### B

The respondent father next claims that the trial court failed to employ the proper standard in assessing whether, pursuant to § 17a-112 (j) (3), he failed to rehabilitate to such a degree as to reasonably encourage a belief that he could assume a responsible position in Xavier's life. He contends that this failure requires reversal of the court's judgment. We are not persuaded.

The consideration of whether the court applied an incorrect legal test presents a question of law, which requires our plenary review. See *In re Jacob W.*, 330 Conn. 744, 754, 200 A.3d 1091 (2019). "The interpretation of a trial court's judgment presents a question of law over which our review is plenary. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all

parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole. . . . If there is ambiguity in a court's memorandum of decision, we look to the articulations [if any] that the court provides." (Internal quotation marks omitted.) *In re James O.*, 322 Conn. 636, 649, 142 A.3d 1147 (2016). "[W]e are mindful that an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . Furthermore, [w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Citation omitted; internal quotation marks omitted.) *In re Jason R.*, 306 Conn. 438, 453, 51 A.3d 334 (2012).

In the present case, the court, in its memorandum of decision, specifically stated that it found "by clear and convincing evidence that the [department] provided reasonable efforts for and on behalf of each parent to reunite them or either of them with their child, but [the respondent] mother was either unwilling or unable to derive from those efforts the benefits necessary to be able to do so and [the respondent] father was unwilling to engage with the resources offered by the [department] and chose to make his own way with providers of his choice and then attempted to deceive each of them by failing to be truthful with them. The result was that he failed to benefit from their efforts.

"Neither [the respondent] mother nor [the respondent] father achieved any level of rehabilitation which might encourage the belief that within a reasonable time each or either of them might reach a point where reunification with Xavier was in Xavier's best interest."

The respondent father argues that the court improperly failed to apply its subordinate factual findings to the statutory requirement that he had not rehabilitated *to such a degree as would encourage a belief that he could assume a responsible position in Xavier's life in the future*. See General Statutes § 17a-112 (j) (3) (B) (i). Rather, he argues, the court found that it was not encouraged to believe that the respondent father had or *could reach a point where reunification with Xavier would be in Xavier's best interest*, and he argues that this does not meet the required legal finding necessary in the adjudicatory phase of a termination of parental rights proceeding under § 17a-112 (j) (3) (B) (i).

The petitioner responds that the respondent father's "claim fails, as the record in this case makes clear that [although] the court did not use the exact words of the statute, its analysis, factual findings, and JD-JM-31 form[4] conform with the statutory requirements." (Footnote added.) She further argues that the court's factual findings demonstrate, when viewed in their entirety, that it made the statutory legal finding that the respondent father had failed to rehabilitate to such a degree as to

reasonably encourage a belief that he could assume a responsible position in Xavier's life. The petitioner points to the court's findings that there was nothing to indicate that the respondent father had benefited from any services or that anything had changed, and that the respondent father still could not place Xavier's needs "before his own anger and need to have things the way he believes is right." The petitioner contends that, read as a whole, the court's decision demonstrates that it found that the respondent father had failed to rehabilitate to such a degree as to reasonably encourage a belief that he could assume a responsible position in Xavier's life.[5] We agree with the petitioner.

We conclude that, although the court did not use the talismanic phrasing of the statute, its framing of the legal question before it, and its findings, taken as a whole, nonetheless, satisfy the statute. The court began its decision by properly explaining: "This matter comes to the court by way of a petition dated June 7, 2018, filed by the [d]epartment . . . seeking the termination of the parental rights of [the respondent mother and the respondent father] . . . . The petition alleges that the child had been adjudicated in a prior proceeding to have been neglected and that mother and father each individually have failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, each or either could assume a responsible position in the life of the child."

The court then proceeded to provide its analysis for granting the petition. It specifically found that the department had little success in engaging the respondent father in services, that the respondent father found his own therapists rather than engage with the ones recommended by the department, that he then lied to those therapists, that he refused to admit that he had engaged in physical violence against the respondent mother, despite nine protective or restraining orders placed against him to protect her from his violent episodes, that he repeatedly lied about his ongoing relationship with the respondent mother, that both Randall and LeCara thought it likely that continued contact between the respondent mother and the respondent father would result in more violence and that it was risky, that the respondent father minimized the significance of the many protective and restraining orders issued against him, that, according to Randall, the respondent father continued to show a pattern of angry, controlling, and intimidating behaviors when he was not being monitored closely, that the respondent father is unlikely to be able to control his anger or place Xavier's needs above his own, that nothing had changed as a result of therapy, that the respondent father lied to the court while under oath, that the respondent father had made no progress toward any reform related to domestic violence, and that the respondent father's per-

sistent dishonesty left the court with little hope that he would change.

Although the court did not recite the precise language of the statute in the concluding sentence of the adjudicatory section of its memorandum of decision, we conclude, on the basis of the court's full decision, that it found that the department had proven, by clear and convincing evidence, the allegations specifically alleged in its petition, namely, that the respondent mother and the respondent father each individually have failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, each or either could assume a responsible position in the life of the child. See *In re James O.*, supra, 322 Conn. 653–55 (considering challenged portion of trial court's "memorandum of decision within the context of the trial court's overall analysis").

In *In re Shane M.*, the only case relied on by the respondent father to support his claim, our Supreme Court explained that "[t]he trial court is required, pursuant to § 17a-112, to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further . . . *such rehabilitation must be foreseeable within a reasonable time.* . . . The statute does not require [a parent] to prove precisely when [he] will be able to assume a responsible position in [his] child's life. Nor does it require [him] to prove that [he] will be able to assume full responsibility for [his] child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation [he] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [he] can assume a responsible position in [his] child's life. . . . In addition, [i]n determining whether a parent has achieved sufficient personal rehabilitation, *a court may consider whether the parent has corrected the factors that led to the initial commitment*, regardless of whether those factors were included in specific expectations ordered by the court or imposed by the department." (Citations omitted; emphasis added; internal quotation marks omitted.) *In re Shane M.*, 318 Conn. 569, 585–86, 122 A.3d 1247 (2015). The standard we employ on appeal, as set forth previously in this opinion, is the following: "As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed." (Internal quotation marks omitted.) *In re James O.*, supra, 322 Conn. 649.

Although it would have been preferable for the trial court to conclude the adjudicatory section of its decision with a legal finding that specifically employed the

precise statutory language, we conclude that the court's decision in this case, when read as a whole, sets forth sufficient factual and legal findings to meet the statutory standard for the requirements of the adjudicatory phase of the proceedings, as set forth in § 17a-112 (j) (3) (B) (i). See id., 655; *In re Shane M.*, supra, 318 Conn. 585–86. Significantly, this is not a case in which the question was the degree of progress the respondent father was making. The court found that the respondent father had made no progress on the key issue on which the court relied for termination—domestic violence in the relationship between the respondent father and the respondent mother. Furthermore, the court concluded that the respondent father not only had made no progress to understand and to address this issue, he also lied to the department, his therapist and the court about the status of his relationship with the respondent mother. Given these factual findings and the fact that the court correctly set forth the legal standard at the beginning of its analysis, we are not persuaded that the court's imprecision in its conclusory statement reflects the application of an incorrect legal standard.

C

The respondent father finally claims that the trial court failed to apply in a proper manner the statutory factors set forth in § 17a-112 (k) when conducting its analysis of whether termination was in Xavier's best interest. Specifically, he argues that the court "fail[ed] to consider and articulate the proper findings necessary under . . . § 17a-112 (k) (3) and (4).[6] In failing to do so, the court's findings are clearly erroneous." (Footnote added.) The petitioner argues that the respondent father's "claim is based on a misunderstanding of the trial court's obligation to consider those statutory factors, as they serve simply as guidelines for the trial court to consider when deciding the best interest of the child and are not mandatory." We conclude that the trial court properly considered the required statutory factors and that its finding as to Xavier's best interest is factually supported and legally sound.

To the extent that the respondent father's claim requires us to interpret the requirements of § 17a-112 (k), our review is plenary. See *In re Nevaeh W.*, 317 Conn. 723, 729, 120 A.3d 1177 (2015). Additionally, "[t]he best interest determination . . . must be supported by clear and convincing evidence. . . . [O]ur function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Cita-

tions omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 487–88, 940 A.2d 733 (2008).

"[T]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . Although a judge [charged with determining whether termination of parental rights is in a child's best interest] is guided by legal principles, the ultimate decision [whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript. . . . [A]lthough a trial court shall consider and make written findings regarding the factors enumerated in § 17a-112 (k), a trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound." (Citation omitted; internal quotation marks omitted.) *In re Nevaeh W.*, supra, 317 Conn. 740.

1

In the present case, the court listed each of the seven factors set forth in § 17a-112 (k) and included its written findings under each. Specifically, on the factor set forth in § 17a-112 (k) (3), which directs the trial court to consider "the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order," the court stated: "The court finds that [the department] made reasonable efforts to reunite the child with [the respondent mother and/or the respondent father] as extensively discussed in the adjudication portion of the memorandum of decision but neither parent was either willing to nor capable of accomplishing the necessary results of those offers of help, assistance, care, guidance and instruction."

The respondent father argues that the court improperly failed to "indicate whether [he had] fulfilled . . . his obligation under the terms of the court-ordered specific steps. In fact, the court does not . . . indicate at any time in its memorandum of decision that [the respondent father] has substantially complied with the steps that were ordered by the court." We are not persuaded.

The court ordered the respondent father to adhere to the following specific steps: (1) keep all appointments set by or with the department, and cooperate with home visits, (2) take part in counseling and make progress toward the identified treatment goals, (3) submit to a substance abuse evaluation and follow the

recommendations about treatment, (4) submit to random drug testing, (5) do not use illegal drugs or abuse alcohol, (6) cooperate with service providers recommended for parenting/individual/family counseling, (7) participate in a substance abuse evaluation and urine screen, (8) follow any and all recommendations, (9) cooperate with court-ordered evaluations or testing, (10) sign necessary releases, (11) get or maintain adequate housing, (12) notify the department about changes in living conditions, (13) cooperate with restraining and/or protective orders to avoid more domestic violence incidents, (14) attend and complete an appropriate domestic violence program, (15) do not get involved further with the criminal justice system and cooperate with probation or parole officers, (16) visit your child as often as the department permits, (17) provide information to the department about possible placement resources for your child, if any, and (18) provide to the department information about the child's grandparents.

In its memorandum of decision, the court specifically found that the respondent father failed to engage in services, that it took ten attempts by the petitioner to engage him in substance abuse evaluations and screenings, that he minimized the significance of the many protective and restraining orders issued against him, that he repeatedly lied to his therapists and that he lied to the court while under oath, that he missed nine of his scheduled appointments with Randall, that nothing had changed despite his participation in services, and that he had failed to achieve any benefit whatsoever from those services. Reading the court's decision as a whole; see *In re Nevaeh W.*, supra, 317 Conn. 733; we conclude that the court clearly found that the respondent father had not fulfilled his obligation under the terms of the court-ordered specific steps.

2

Section 17a-112 (k) (4) "directs the trial court to consider the [child's] emotional ties with a long list of people in determining whether the termination of the respondent's parental rights is in [his] best interest." Id., 731; see footnote 6 of this opinion. In the present case, the court specifically found: "Xavier has developed significant emotional ties to his current caregivers. He is truly part of the family which has been his family for all of his life less approximately ten months." The respondent father argues that the court's finding "does not even attempt to consider the require[d] statutory language . . . ." We are not persuaded.

As explained in *In re Nevaeh W.*, "[n]othing in [§ 17a-112 (k) (4)] . . . require[s] the trial court to consider only the [child's] emotional ties with the respondent [father]. To the contrary . . . it [is] appropriate for the trial court to consider the [child's] emotional ties to the preadoptive foster family in considering whether

termination of the [respondent father's] parental rights [is] in the [child's] best interest. . . . Furthermore, in considering the trial court's findings pursuant to § 17a-112 (k) (4), we are mindful that an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding." (Citations omitted; internal quotation marks omitted.) *In re Nevaeh W.*, supra, 317 Conn. 731–33.

Reading the trial court's memorandum of decision as a whole; see id., 733; we conclude that, although the court did not explicitly address Xavier's emotional ties to the respondent father, it did discuss their relationship, as well as Xavier's bond with his foster family. Specifically, the court found that "Xavier has been out of his parents' care for over thirty-four months. He is only three years ten months old. Dr. Randall stated in testimony in this case her recommendation that Xavier be placed permanently with someone other than [the respondent] mother and/or [the respondent] father. He has been placed in a legal risk foster home where he is making excellent strides and has developed an attachment to his caregivers, a couple who also have a three year old son who has formed a bond with Xavier as Xavier has with him and with his parents. He is healthy and all of his medical, dental, psychological and educational needs are being met. This couple wishes to adopt Xavier. This clearly is in Xavier's best interest."

The court found that "[the respondent] father grabbed [the respondent] mother's arm with such strength that it left marks on her arm noticeable to the police when they arrived and [the respondent] mother was holding Xavier in her arms when this event happened." It also found that the respondent father's therapist believed that the respondent father was unable to place the needs of Xavier before his own anger and his need to have things done his way. The court also found that the respondent father "is in need of therapy to work toward accepting personal responsibility, anger control, relationship issues, and a better understanding of his son's needs including the impact on his son of being exposed to conflict, violence, and/or substance abuse." We find our Supreme Court's decision in *In re Nevaeh W.* to be instructive. In that case, the trial court's entire finding regarding the "emotional ties" requirement of § 17a-112 (k) (4) was: "Both children have been placed together with a preadoptive resource who has expressed a willingness to adopt both girls. They are comfortable, secure and safe." (Internal quotation marks omitted.) *In re Nevaeh W.*, supra, 317 Conn. 731. This court reversed the judgment of the trial court because the trial court's finding pursuant to § 17a-112 (k) (4) was " 'utterly unresponsive to the mandatory statutory requirement . . . .' " Id. Our Supreme Court reversed the decision of this court, opining that a discussion of the respondent's relationship with the children, found earlier in the trial court's memorandum of deci-

sion, was sufficient to meet the "emotional ties" requirement of § 17a-112 (k) (4). Id., 733. Specifically, the court stated: "Reading the trial court's memorandum of decision in the present case as a whole, we conclude that the trial court did consider the factor set forth in § 17a-112 (k) (4), including the children's emotional ties to the respondent. Specifically, the trial court explained at the beginning of the memorandum that 'Nevaeh . . . has been in [the petitioner's] care on three separate occasions. On September 4, 2008, Nevaeh . . . was placed [on a ninety-six hour hold because the respondent] was homeless and had no way to care for the child. She was committed to [the petitioner] in October, 2008 and reunified to the [respondent's] care in January, 2009. In April, 2009, the child was placed in another [ninety-six] hour hold and again committed to [the petitioner] after [the respondent] was discharged from a drug treatment program for noncompliance. The child was reunified with [the respondent] in December, 2010. On July 2, 2012, Nevaeh was removed from [the respondent] for a third time.' The trial court continued: '[Janiyah] resided with [the respondent] until [Janiyah was] removed with Nevaeh . . . on July 2, 2012. On November 30, 2012, both children were placed in a preadoptive foster home. Nevaeh . . . has previously been placed with this family for [more than one] year.' These findings by the trial court demonstrate that the trial court did consider the children's relationship with the respondent." Id., 733–34.

After concluding that the trial court had satisfied § 17a-112 (k) (4) through the findings in its memorandum of decision, our Supreme Court, in an effort to clarify any perceived ambiguity in the trial court's reasoning, then went on to review the trial court's articulations, in which it more directly addressed the emotional ties of the respondent and the children. Id., 734–38. The Supreme Court, though, in no way suggested that any ambiguity in the trial court's judgment would require reversal in the absence of an articulation. To the contrary, the Supreme Court relied on the well settled law that "we read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Internal quotation marks omitted.) Id., 733.

Finally, the court in *In re Nevaeh W.* addressed the petitioner's claim that the trial court was not required to make explicit findings as to each aspect of the seven factors enumerated in § 17a-112 (k). In doing so, the court reaffirmed its holding in *In re Eden F.*, 250 Conn. 674, 741 A.2d 873 (1999), that the factors in § 17a-112 (k) serve as a guide to the trial court when making its decision whether to grant a petition to terminate parental rights: "As we explained in *In re Eden F.*, 'the fact that the legislature [had interpolated] objective guidelines into the open-ended fact-oriented statutes which govern [parental termination] disputes . . . should not be construed as a predetermined weighing

of evidence . . . by the legislature. Where . . . the record reveals that the trial court's ultimate conclusions [regarding termination of parental rights] are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding . . . .' " *In re Nevaeh W.*, supra, 317 Conn. 739–40. The court further stated that, "although a trial court shall consider and make written findings regarding the factors enumerated in § 17a-112 (k), a trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound." Id., 740.

In the present case, as did the trial court in *In re Nevaeh W.*, the court specifically addressed the respondent father's relationship with Xavier although it did not address explicitly the "emotional ties" between the two. See id., 733. Although we do not have an articulation to further clarify any perceived ambiguity, we conclude that any lack of clarity on this specific factor was harmless because the record reveals that, even if Xavier had strong emotional ties to the respondent father, the court's determination that termination of the respondent father's parental rights was in Xavier's best interest is factually supported and legally sound.

## II

## AC 43774

On appeal,[7] the respondent mother claims that the trial court (1) failed to employ the proper standard in assessing whether, pursuant to § 17a-112 (j) (3), she failed to rehabilitate to such a degree as to reasonably encourage a belief that she could assume a responsible position in Xavier's life, (2) erred in finding that she had failed to rehabilitate, and (3) failed to make complete written findings concerning the statutory factors set forth in § 17a-112 (k) when considering whether termination was in Xavier's best interest.

After setting forth the trial court's relevant factual findings related to the respondent mother, we will consider each of her claims in turn. Xavier was born in early 2016, and, in August, 2016, the Norwich Police contacted the department because the respondent father had grabbed the respondent mother's arm, while she was holding Xavier, with such strength that it left marks on her arm noticeable to the police. The department, thereafter, referred her to various appropriate services in an attempt to engage her in rehabilitative and guidance services that she needed so that she could be reunited with Xavier. The respondent mother engaged in services and obtained medication, which she admitted to abusing. She also admitted to abusing another medication that was not prescribed to her. She continued to test positive for unprescribed medications

in 2017. The respondent mother was criminally charged with risk of injury to a child and operation of a motor vehicle while under the influence of alcohol and/or drugs.[8]

On February 14, 2017, the respondent mother completed a substance abuse evaluation at Care Plus, where she was recommended for intensive outpatient care for opioid dependence. She discharged herself from the program, however, after having a conflict with the providing physician. The respondent mother consistently has shown resistance to participating in any domestic violence counseling program. The counselors to whom she went for treatment could not ascertain whether she understood the cycle of domestic violence. The court found that the respondent mother wants nothing to do with domestic violence counseling, although domestic violence has been an ongoing issue for her. Such violence played a large part in the removal of her other child, which led to the termination of her parental rights as to that child in 2008. The court concluded that the respondent mother clearly is unwilling to engage in such counseling even though that was an issue leading to the prior termination and is again an issue in this case. The department, nevertheless, continued to offer her necessary services, despite her unwillingness.

The respondent mother was diagnosed by Randall with post-traumatic stress disorder, generalized anxiety disorder and alcohol use disorder in remission. She noted that the respondent mother was in need of continued therapy to work on her mood and anxiety, decision making, conflict resolution skills, emotional controls, and to get a better understanding of Xavier's needs. The respondent mother had shared with Randall that the respondent father had been physically abusive to her beginning just six months into their relationship, which had lasted more than ten years at the time of trial.

The court credited Randall's opinion that the respondent mother's interactions were indicative of a continued inability to place Xavier's needs first. The court quoted Randall as opining that the respondent mother "was angry and argumentative with the foster mother, in the presence of Xavier, and she repeatedly undermined Xavier's relationship with his foster mother. She demonstrated no understanding of Xavier's need to view his foster parents in a parental role, and she did not acknowledge that her own clear anger and disagreement with the foster mother could cause emotional disruption for her son." (Internal quotation marks omitted.)

Additionally, the court found that during the time of the respondent mother's relationship with the respondent father, nine restraining or protective orders had been issued to protect her. The court also found that despite all the violence, the respondent mother and the respondent father continued to maintain a relationship,

as demonstrated by the respondent father's overnight visits to the respondent mother's home, which lasted until the morning, but that neither would admit to it. The court also found that the respondent mother lied to the department about her relationship with the respondent father. One of the respondent mother's service providers, Child and Family Services, recommended that she engage in individual therapy with a provider who specialized in domestic violence intervention as part of her treatment, but she refused to consider it. The court found that "she has not gained an understanding of the deleterious effects of domestic violence nor the lack of ability to care for the needs of Xavier as those needs relate to the issues surrounding domestic violence and she has no intention to address the issues at any time."

The court then concluded the adjudicatory section of its memorandum of decision by finding "by clear and convincing evidence that the [department had] provided reasonable efforts for and on behalf of each parent to reunite them or either of them with their child, but [that the respondent] mother was either unwilling or unable to derive from those efforts the benefits necessary to be able to do so . . . . Neither [the respondent] mother nor [the respondent] father achieved any level of rehabilitation which might encourage the belief that within a reasonable time each or either of them might reach a point where reunification with Xavier was in Xavier's best interest." In the dispositional portion of its decision, the court examined the seven factors set forth in § 17a-112 (k), and concluded that it was in Xavier's best interest for the respondent mother's parental rights to be terminated. Additional facts relevant to the respondent mother's appeal will be set forth as necessary to address her claims.

A

The respondent mother claims that the trial court failed to employ the proper standard in assessing whether, pursuant to § 17a-112 (j) (3), she failed to rehabilitate to such a degree as to reasonably encourage a belief that she could assume a responsible position in Xavier's life. We are not persuaded.

As we explained in part I B of this opinion, the consideration of whether the court applied an incorrect legal test presents a question of law, which requires our plenary review. See *In re Jacob W.*, supra, 330 Conn. 754. "[A]n opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . Furthermore, [w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Citation omitted; internal quotation marks omitted.) *In re Jason R.*, supra, 306 Conn. 453.

The trial court found "by clear and convincing evi-

dence that the [department] provided reasonable efforts for and on behalf of each parent to reunite them or either of them with their child, but [the respondent] mother was either unwilling or unable to derive from those efforts the benefits necessary to be able to do so . . . . Neither [the respondent] mother nor [the respondent] father achieved any level of rehabilitation which might encourage the belief that within a reasonable time each or either of them might reach a point where reunification with Xavier was in Xavier's best interest.''

The respondent mother argues that the court used an "improper standard for rehabilitation." She contends that the court's finding employed a higher, more stringent standard for the respondent mother to meet than is mandated under § 17a-112 (j) (3) (B) (i). She contends that the court failed to find that she had not rehabilitated to such a degree as would encourage a belief that she could assume a responsible position in Xavier's life in the future. As with the respondent father's appeal setting forth essentially the same claim, we conclude that the court, although using less than precise language in its concluding sentence of the adjudicatory section of its decision, employed the proper standard under § 17a-112 (j) (3) (B) (i). See *In re James O.*, supra, 322 Conn. 655; *In re Shane M.*, supra, 318 Conn. 585–86; see also part I B of this opinion.

The court began its decision by properly explaining: "This matter comes to the court by way of a petition dated June 7, 2018, filed by the [petitioner] . . . seeking the termination of the parental rights of [the respondent mother and the respondent father] . . . . The petition alleges that the child had been adjudicated in a prior proceeding to have been neglected and that mother and father each individually have failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, *each or either could assume a responsible position in the life of the child.*" (Emphasis added.) The court then proceeded to set forth factual findings and to provide its analysis for granting the petition.

The court found that the respondent mother engaged in services and obtained medication, which she then admitted to abusing, in addition to another medication that she was not prescribed, and she continued to test positive for unprescribed medications in 2017. The court found that the respondent mother completed a substance abuse evaluation at Care Plus, where she was recommended for intensive outpatient care for opioid dependence, and, although she attended the intensive program, she discharged herself after having a conflict with the providing physician. The court additionally found that the respondent mother consistently has shown resistance to participating in any domestic violence counseling program and that she wants nothing

to do with domestic violence counseling, although such violence has been an issue for her since at least 2006. The court found that Randall had opined that the respondent mother's interactions were indicative of a continued inability to place Xavier's needs first. The court quoted Randall as opining that the respondent mother " 'was angry and argumentative with the foster mother, in the presence of Xavier, and she repeatedly undermined Xavier's relationship with his foster mother. She demonstrated no understanding of Xavier's need to view his foster parents in a parental role, and she did not acknowledge that her own clear anger and disagreement with the foster mother could cause emotional disruption for her son.' " The court further found that, despite all the violence, the respondent mother continued to maintain a relationship with the respondent father and that she had lied about it. The court found that "she has not gained an understanding of the deleterious effects of domestic violence nor the lack of ability to care for the needs of Xavier as those needs relate to the issues surrounding domestic violence and she has no intention to address the issues at any time."

Although the court did not follow the language of the statute in the concluding sentence of the adjudicatory section of its memorandum of it decision, on the basis of our review of the court's full decision, it is apparent that the court found that the petitioner had proven, by clear and convincing evidence, the allegations of its petition, namely, that Xavier had been adjudicated in a prior proceeding to have been neglected and that the respondent mother and the respondent father "each individually have failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child, each or either could assume a responsible position in the life of the child." See *In re James O.*, supra, 322 Conn. 653–55 (considering challenged portion of trial court's "memorandum of decision within the context of the trial court's overall analysis"). As with the respondent father, the court's findings as to the respondent mother were that the respondent mother had essentially ignored the domestic violence issue that was the basis of the court's conclusion that she failed to rehabilitate and that she has no intention to address the issue. We conclude that the court's decision in this case, when read as a whole, sets forth sufficient factual and legal findings to meet the statutory standard for the adjudicatory requirements of § 17a-112 (j) (3) (B) (i). See id., 655; *In re Shane M.*, supra, 318 Conn. 585–86.

### B

The respondent mother next claims that the trial court erred in finding that she had failed to rehabilitate. She contends that the court's error, at least in part, was due to its clearly erroneous subordinate factual finding

that she had refused or was unwilling to address the issue of domestic violence. We are not persuaded.

"We review the trial court's subordinate factual findings for clear error, and review its finding that the respondent [mother] failed to rehabilitate for evidentiary sufficiency. . . . In reviewing that ultimate finding for evidentiary sufficiency, we inquire whether the trial court could have reasonably concluded, upon the facts established and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence was sufficient to justify its [ultimate conclusion]. . . . We emphasize that [i]t is not the function of this court to sit as the [fact finder] when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the [judgment], whether the totality of the evidence, including reasonable inferences therefrom, supports the [judgment of the trial court] . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the [judgment] of which it is reasonably capable. . . . In other words, [i]f the [trial court] could reasonably have reached its conclusion, the [judgment] must stand, even if this court disagrees with it." (Citations omitted; internal quotation marks omitted.) *In re Jayce O.*, supra, 323 Conn. 715–16.

1

We first consider the respondent mother's claim that the court's subordinate factual finding, that she had refused or was unwilling to address the issue of domestic violence, was clearly erroneous. She argues that she had attended domestic violence programs, including the Survivor Project and Safe Futures, and that the department had acknowledged that she successfully had completed the domestic violence work that had been recommended by the department. The petitioner argues that the evidence clearly demonstrates that the respondent mother "failed to rectify the most significant deficiency present in her life both before and after Xavier's birth, specifically, her domestic violence history with [the respondent] father . . . and her inability to resolve their toxic and conflictual relationship, which impaired her ability to care for Xavier." We agree with the petitioner.

The record reveals that Randall testified that the respondent mother "had a history of relationships with domestic violence in them, including the relationship with [the respondent] father." She testified that the respondent mother told her that she and the respondent father were no longer together and that she, therefore, "did not see a need . . . to participate in domestic violence treatment . . . [but that] she was willing to do so because it was required by [the department]." Randall further testified that, in her professional opinion, the continued relationship between the respondent mother and the respondent father "puts Xavier at risk

for being exposed to continued conflict and violence in the home."

Carolyn Ryan, a social worker with the department, testified that, "given the evidence . . . that [the respondent mother and the respondent father] are in a relationship [that] means that they haven't addressed the core issue in their relationship, which was . . . intimate partner violence." She also agreed that, although the respondents had attended therapy, it did not mean that they actually had derived any benefit from the services rendered, in part, because they were not honest with respect to their relationship. Ryan explained: "There was a—the bigger issue is dealing with the domestic violence and being fully forthcoming and honest with your providers, and that's something that neither [of the respondents] have done throughout the time that they've been involved with the department. So in terms of—our assessment is that . . . [the respondent mother] has not made the progress needed based on the fact that during this time, while she made progress, she went to services, but she wasn't honest with the people that are working with her, her therapeutic providers. That included her individual therapist. That included the clinician that [was] doing coparenting."

Ryan also explained: "The main concern [of the department] is the [respondents'] complete lack of honesty throughout this entire case, and that is because of their extremely long history, documented history of intimate partner violence [to] which their child, Xavier, was exposed . . . . And that while they—presumably in services . . . did make some progress . . . there wasn't—the progress wasn't made. They didn't work on the very issue that is the issue, [namely] . . . the intimate partner violence . . . . [T]hey're not working on the issue that is of the main—of the most concern, [namely] . . . the violence and the [presumption that if] the child's placed back in their care that Xavier could be exposed to once again."

Lorraine Thomas, a social work supervisor with the department, testified that "the department believes that the [respondent] parents remain engaged in a relationship and that there has been significant domestic violence in that relationship. The department believes that [the respondent mother] is a victim of domestic violence and that [she] does not clearly understand the risk of being a victim, and so she would do [what] the abuser is telling her to do, which is lie to the department so that their child can be reunified and then put in a— possibly put in a situation that's going to retraumatize this child." Thomas also testified: "The issue is, is that we removed the child because of domestic violence, because of substance abuse, and the domestic violence piece, even though [the respondents have] engaged in services, they weren't truthful to the providers in order

to work on the appropriate services for them. They have not been truthful to the department . . . . But as a supervisor of the case with a young child under the age of five, significantly concerned that we would do nothing. The parents have not engaged in appropriate services because they have not been truthful, so the providers could not treat them accordingly in order to reunify their child with them." She agreed that "there is every indication from the department's perspective that the pattern of domestic violence, the pattern of volatile interaction and engagement and then disengagement, is continuing . . . ."

On the basis of the clear, foregoing testimony, we conclude that the court's finding that the respondent mother refused or was unwilling to address the issue of domestic violence was not clearly erroneous.

2

We next address the respondent mother's claim that the evidence at trial was not sufficient to support the trial court's conclusion that the petitioner met its burden of proof, by clear and convincing evidence, that the respondent mother failed to achieve rehabilitation. She argues that "[t]he trial court's findings that [the respondent] mother was unwilling to benefit from the department's efforts and that she refused to address the issue of domestic violence are belied by [her] participation in the numerous programs to which she was referred, including parenting services and domestic violence treatment, by her progress in achieving sobriety and stability, and by her positive relationship with Xavier." We disagree.

The trial court found that the respondent mother consistently has shown resistance to participating in any domestic violence counseling program, and that she wants nothing to do with domestic violence counseling, although domestic violence has been an issue for her over the course of many years. The court also relied on Randall's assessments that the respondent mother's interactions were indicative of a continued inability to place Xavier's needs first, and that the respondent mother " 'was angry and argumentative with the foster mother, in the presence of Xavier, and she repeatedly undermined Xavier's relationship with his foster mother. She demonstrated no understanding of Xavier's need to view his foster parents in a parental role, and she did not acknowledge that her own clear anger and disagreement with the foster mother could cause emotional disruption for her son.' " The court found that, despite all the violence, the respondent mother continued to maintain a relationship with the respondent father and that she continued to lie about it. The court also made the explicit finding that the respondent mother had not "gained an understanding of the deleterious effects of domestic violence nor the lack of ability to care for the needs of Xavier as those needs relate

to the issues surrounding domestic violence and she has no intention to address the issues at any time." Additionally, the court made findings about the respondent mother's abuse of medications, finding that she continued to test positive for unprescribed medications in 2017, and that she self-discharged from an intensive outpatient care program because she was having a conflict with the providing physician. Although the court certainly noted some positive things about the respondent mother, those do not minimize the findings that led the court to conclude that she had failed to rehabilitate. Our law is quite clear; on appeal, we can neither weigh the evidence nor substitute our judgment for that of the trial court. See *In re Shane M.*, supra, 318 Conn. 593 and n.20; see also *In re Jayce O.*, supra, 323 Conn. 716.

After reviewing the evidentiary sufficiency of the court's ultimate finding that the respondent mother failed to rehabilitate, we conclude, on the basis of the subordinate facts found and the reasonable inferences drawn therefrom, that the cumulative effect of the evidence is sufficient to support the court's ultimate conclusion.

C

The respondent mother's final claim is that the trial court erred in concluding that termination of her parental rights was in Xavier's best interest because the court failed to make complete written findings concerning the statutory factors set forth in § 17a-112 (k). She argues that the court failed to make sufficient findings under three of the statutory factors, namely, "the extent to which [the respondent] mother fulfilled her obligations under the specific steps, the child's emotional ties with [her], and [her] efforts to adjust her circumstances."[9] We conclude that the court's findings complied with § 17-112 (k).

To the extent that the respondent mother's claim requires us to interpret the requirements of § 17a-112 (k), our review is plenary. See *In re Nevaeh W.*, supra, 317 Conn. 729. Additionally, as we explained in part I C of this opinion: "[T]he balancing of interests in a case involving termination of parental rights is a delicate task and, when supporting evidence is not lacking, the trial court's ultimate determination as to a child's best interest is entitled to the utmost deference. . . . Although a judge [charged with determining whether termination of parental rights is in a child's best interest] is guided by legal principles, the ultimate decision [whether termination is justified] is intensely human. It is the judge in the courtroom who looks the witnesses in the eye, interprets their body language, listens to the inflections in their voices and otherwise assesses the subtleties that are not conveyed in the cold transcript. . . . [A]lthough a trial court shall consider and make written findings regarding the factors enumerated in

§ 17a-112 (k), a trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound." (Citation omitted; internal quotation marks omitted.) Id., 740.

1

The respondent mother first argues that the court failed to make sufficient findings under § 17-112 (k) (3), which requires the court to address "the extent to which [the respondent] mother fulfilled her obligations under the specific steps . . . ."

In the present case, in its memorandum of decision, the court listed each of the seven factors set forth in § 17a-112 (k) and included its written findings under each. Specifically, on the factor set forth in § 17a-112 (k) (3), which directs the trial court to consider "the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order," the court stated: "The court finds that [the department] made reasonable efforts to reunite the child with [the respondent mother and/or the respondent father] as extensively discussed in the adjudication portion of this memorandum of decision but neither parent was either willing to nor capable of accomplishing the necessary results of those offers of help, assistance, care, guidance and instruction."

The respondent mother now argues that the court "failed to consider whether all parties had fulfilled their obligations, as it did not make any written finding regarding whether, and to what extent, [the respondent] mother had actually fulfilled her obligations under the relevant court orders, i.e., the specific steps." We disagree.

The court ordered the following specific steps for the respondent mother: (1) keep all appointments set by or with the department, and cooperate with home visits, (2) take part in counseling and make progress toward the identified treatment goals, (3) submit to a substance abuse evaluation and follow the recommendations about treatment, (4) submit to random drug testing, (5) do not use illegal drugs or abuse alcohol or medication, (6) cooperate with service providers recommended for counseling, in-home support services and substance abuse assessment and treatment, following any and all recommendations and participate in a substance abuse evaluation and urine screen, (8) cooperate with court-ordered evaluations or testing, (9) sign necessary releases, (10) get or maintain adequate housing, (11) notify the department about changes in living conditions, (12) obtain and/or cooperate with restraining and/or protective orders to avoid more domestic violence incidents, (13) attend and complete an appropriate domestic violence program, (14) do not

get involved further with the criminal justice system and cooperate with probation or parole officers, (15) visit your child as often as the department permits, (16) provide information to the department about possible placement resources for your child, if any, and (17) provide to the department information about the child's grandparents.

In its memorandum of decision, the court specifically found that the respondent mother had engaged in services and obtained medication, which she then admitted to abusing, in addition to another medication that she had not been prescribed, and she continued to test positive for unprescribed medications in 2017. The court found that the respondent mother discharged herself from an extensive outpatient treatment program that had been recommended, that she has demonstrated a resistance to participating in domestic violence counseling programs, and that she wants nothing to do with domestic violence counseling, although she has been in violent relationships, including during her ten year relationship with the respondent father. In its memorandum of decision, the court also relied on Randall's opinion that the respondent mother's continued interactions with the respondent father were indicative of an ongoing inability to place Xavier's needs first, and that the respondent mother " 'was angry and argumentative with the foster mother, in the presence of Xavier, and she repeatedly undermined Xavier's relationship with his foster mother. She demonstrated no understanding of Xavier's need to view his foster parents in a parental role, and she did not acknowledge that her own clear anger and disagreement with the foster mother could cause emotional disruption for her son.' " The court further found that, despite all the violence, the respondent mother continued to maintain a relationship with the respondent father and that she lied about it. The court also specifically found that "she has not gained an understanding of the deleterious effects of domestic violence nor the lack of ability to care for the needs of Xavier as those needs relate to the issues surrounding domestic violence and she has no intention to address the issues at any time." Reading the court's decision as a whole, as we must; see *In re Nevaeh W.*, supra, 317 Conn. 733; we conclude that the court did consider and make findings as to the respondent mother's efforts to fulfill her obligation under the terms of the court-ordered specific steps.

2

The respondent mother next argues that the court failed to make sufficient findings concerning Xavier's emotional ties with her. We conclude that the court sufficiently addressed § 17a-112 (k) (4), but, even if the court's decision could be considered ambiguous as to this finding, its ultimate conclusion is sufficiently supported by the evidence and is legally sound.

Section 17a-112 (k) (4) "directs the trial court to consider the [child's] emotional ties with a long list of people in determining whether the termination of the respondent's parental rights is in [his] best interest." *In re Nevaeh W.*, supra, 317 Conn. 731; see footnote 6 of this opinion. Here, the court specifically found: "Xavier has developed significant emotional ties to his current caregivers. He is truly part of the family which has been his family for all of his life less approximately ten months."[10]

In *In re Nevaeh W.*, our Supreme Court stated that "[n]othing in [§ 17a-112 (k) (4)] . . . required the trial court to consider only the [child's] emotional ties with the respondent [mother]. To the contrary . . . it was appropriate for the trial court to consider the [child's] emotional ties to the preadoptive foster family in considering whether termination of the [respondent mother's] parental rights was in the [child's] best interest." *In re Nevaeh W.*, supra, 317 Conn. 731. "Furthermore, in considering the trial court's findings pursuant to § 17a-112 (k) (4), we are mindful that an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding." (Internal quotation marks omitted.) Id., 733.

Reading the trial court's memorandum of decision as a whole, as we must; see id.; we conclude that the court's findings were sufficient to comply with § 17a-112 (k) (4). The court found that "Xavier has been out of his parents' care for over thirty-four months. He is only three years ten months old. Dr. Randall stated in testimony in this case her recommendation that Xavier be placed permanently with someone other than [the respondent] mother and/or [the respondent] father. He has been placed in a legal risk foster home where he is making excellent strides and has developed an attachment to his caregivers, a couple who also have a three year old son who has formed a bond with Xavier as Xavier has with him and with his parents. He is healthy and all of his medical, dental, psychological and educational needs are being met. This couple wishes to adopt Xavier. This clearly is in Xavier's best interest." The court also found that the respondent mother was unable to put Xavier's needs first, and that "she has not gained an understanding of the deleterious effects of domestic violence nor the lack of [her] ability to care for the needs of Xavier as those needs relate to the issues surrounding domestic violence." Guided by our Supreme Court's decision in *In re Nevaeh W.*, supra, 317 Conn. 733–34, we conclude that these subordinate factual findings by the trial court, although not explicitly addressing Xavier's emotional ties to the respondent mother, demonstrate that the court considered the respondent mother's relationship with Xavier and the possible dangers presented by it, as well as his relationship and bond and emotional ties to his foster family.

See our further discussion of *In re Nevaeh W.* in part I C 2 of this opinion. Furthermore, to the extent that the court's findings under § 17a-112 (k) (4) could be considered ambiguous as to Xavier's emotional ties with the respondent mother, we conclude that the court's overall decision supports its ultimate conclusion that termination of the respondent mother's parental rights was in Xavier's best interest. See *In re Nevaeh W.*, supra, 740 ("although a trial court shall consider and make written findings regarding the factors enumerated in § 17a-112 (k), a trial court's determination of the best interests of a child will not be overturned on the basis of one factor if that determination is otherwise factually supported and legally sound"); see also *In re Eden F.*, supra, 250 Conn. 691.

3

The respondent mother also argues that the court failed to make sufficient findings about her efforts to adjust her circumstances, as required under § 17a-112 (k) (6).[11] She argues that the court "did not make any findings at all with respect to [her] *efforts* in its response to this factor. Rather, the court [spoke only] to [her] making 'minimal progress' . . . and that it would be inappropriate to consider reunification since [she] has not made any meaningful changes to her life . . . ." (Emphasis in original.) We conclude that the court's findings sufficiently address this factor.

In its decision, the court specifically found that the respondent mother "*resisted* participating in any domestic violence counseling program . . . [and] that she clearly is *unwilling to engage* in such counseling . . . ." (Emphasis added.) The court also found that "she repeatedly undermined Xavier's relationship with his foster mother." (Internal quotation marks omitted.) Additionally, the court found that, "[d]uring the time of their relationship, nine restraining or protective orders ha[d] been issued by various judicial authorities trying to protect [her] from [the respondent] father . . . [and] [i]t was [she] who repeatedly sought the courts to modify those orders on behalf of [the respondent] father. Although both [respondents] now maintain that the relationship is over and they no longer see each other, that seems not to be the truth and raises a question as to the honesty of each [respondent] on a critical issue of the case—domestic violence. . . . Recognizing that domestic violence was a prominent factor causing this case to arise and recognizing that [the respondent] mother *has refused* to address in any way this serious issue which was present at the beginning of this case causes the court to have *grave concern about the sincerity of* [*the respondent*] *mother's intentions* as she goes through the motions to address the various issues noted by [the department]." (Emphasis added.) Furthermore, the court found that "it would be inappropriate to consider reunification . . . since [the respondent] mother

*has not made any meaningful changes* to her life
. . . .'' (Emphasis added.) We conclude that all of these
facts address the respondent mother's efforts or the
lack thereof. Reviewing the court's findings as a whole;
see *In re Nevaeh W.*, supra, 317 Conn. 733; we conclude
that the court's factual findings were more than suffi-
cient to address § 17a-112 (k) (6).

On the basis of the foregoing analysis, we conclude
that the court's ultimate conclusion that it was in Xavi-
er's best interest to terminate the respondent mother's
parental rights is factually supported and legally sound.

The judgment is affirmed.

In this opinion the other judges concurred.

\* In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the Appellate Court.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3)
(2018); we decline to identify any party protected or sought to be protected
under a protective order or a restraining order that was issued or applied
for, or others through whom that party's identity may be ascertained.

\*\* October 22, 2020, the date that this decision was released as a slip
opinion, is the operative date for all substantive and procedural purposes.

[1] In both appeals, the attorney for Xavier has adopted the brief of the
petitioner, the Commissioner of Children and Families.

[2] General Statutes § 17a-112 (j) (3) (B) (i) provides in relevant part: "The
Superior Court, upon notice and hearing . . . may grant a petition filed
pursuant to this section if it finds by clear and convincing evidence that
. . . the child . . . has been found by the Superior Court . . . to have been
neglected, abused or uncared for in a prior proceeding . . . and the parent
of such child has been provided specific steps to take to facilitate the return
of the child to the parent pursuant to section 46b-129 and has failed to
achieve such degree of personal rehabilitation as would encourage the belief
that within a reasonable time, considering the age and needs of the child,
such parent could assume a responsible position in the life of the child
. . . .''

[3] The court explained that "[d]ialectical [b]ehavior [t]herapy is an evi-
dence-based psychotherapy to treat borderline personality disorder and is
useful in treating patients seeking change in behavioral patterns such as
substance abuse and domestic or non-domestic violence against others. It
is a process in which the therapist helps the patient find and employ strate-
gies and ultimately synthesize them to accomplish consistently the defined
ultimate goal and is used to treat borderline personality disorders and
addictive personality disorders. To be successful, it demands honesty both
from the patient and the clinician."

[4] Form JD-JM-31 is a Judicial Branch form entitled "ORDER, TERMINA-
TION OF PARENTAL RIGHTS AND APPOINTMENT OF STATUTORY PAR-
ENT/GUARDIAN." In this case, the form contains the required statutory
language. However, it was signed by the deputy chief clerk on behalf of the
trial judge and not by the trial judge.

[5] The petitioner also argues that if there is ambiguity in the court's judg-
ment, this court should read the decision to support the judgment, especially
in light of the respondent father's failure to file a motion for articulation.
See Practice Book § 66-5.

[6] General Statutes § 17a-112 (k) provides in relevant part: "Except in the
case where termination of parental rights is based on consent, in determining
whether to terminate parental rights under this section, the court shall
consider and shall make written findings regarding . . . (3) the terms of
any applicable court order entered into and agreed upon by any individual
or agency and the parent, and the extent to which all parties have fulfilled
their obligations under such order; [and] (4) the feelings and emotional ties
of the child with respect to the child's parents, any guardian of such child's
person and any person who has exercised physical care, custody or control
of the child for at least one year and with whom the child has developed
significant emotional ties . . . .''

[7] The initial facts and relevant procedural history, as well as our standard of review and general governing principles regarding a challenge to the trial court's decision on a termination of parental rights petition, were set forth previously in this opinion.

[8] The record reveals that in January, 2017, the respondent mother was living with Xavier at the Covenant Shelter (shelter). A worker at the shelter notified the department that the respondent mother was intoxicated while caring for Xavier. The respondent father also telephoned the department to say that he had been with the respondent mother and that she may have been intoxicated when she returned to the shelter. The respondent mother was arrested for risk of injury to a child, and the department removed Xavier from her care. Then, on June 7, 2017, the respondent mother was arrested for driving while under the influence. Both of those charges were pending at the time of the termination proceedings.

[9] The respondent mother concedes in her brief that "[t]he seven factors serve simply as guidelines for the court and are not statutory prerequisites. There is no requirement that each factor be proven by clear and convincing evidence."

[10] The respondent mother states that Xavier was not placed with this foster family until December, 2017. We conclude that this misstatement is not relevant to the court's decision.

[11] General Statutes § 17a-112 (k) (6) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding . . . the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child . . . ."

---